LEHNERT ET AL. *v.* FERRIS FACULTY
ASSOCIATION ET AL.

No. 89–1217.   Argued November 5, 1990—Decided May 30, 1991

508

BLACKMUN, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, III–B, III–C, IV–B (except for the final paragraph), IV–D, IV–E, and IV–F, in which REHNQUIST, C. J., and WHITE, MARSHALL, and STEVENS, JJ., joined, and an opinion with respect to Parts III–A and IV–A, the final paragraph of Part IV–B, and Parts IV–C and V, in which REHNQUIST, C. J., and WHITE and STEVENS, JJ., joined. MARSHALL, J., filed an opinion concurring in part and dissenting in part, *post*, p. 533. SCALIA, J., filed an opinion concurring in the judgment in part and dissenting in part, in which O'CONNOR and SOUTER, JJ., joined, and in all but Part III–C of which KENNEDY, J., joined, *post*, p. 550. KENNEDY, J., filed an opinion concurring in the judgment in part and dissenting in part, *post*, p. 562.

*Raymond J. LaJeunesse, Jr.*, argued the cause and filed briefs for petitioners.

*Robert H. Chanin* argued the cause for respondents. With him on the brief was *Bruce R. Lerner*.*

*Briefs of *amici curiae* urging affirmance were filed for the American Federation of Labor and Congress of Industrial Organizations by *Marsha S. Berzon* and *Laurence Gold;* for the American Federation of State, County and Municipal Employees Councils 1, 52, 71, 73, et al. by *Lawrence A. Poltrock, Richard Kirschner, Paul Schachter, Patrick M. Scanlon*, and *James B. Coppess*.

Briefs of *amici curiae* urging reversal were filed for Landmark Legal Foundation by *Jerald L. Hill* and *Mark Bredemeier;* for the Center on Na-

JUSTICE BLACKMUN announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, III–B, III–C, IV–B (except for the final paragraph), IV–D, IV–E, and IV–F, and an opinion with respect to Parts III–A and IV–A, the final paragraph of Part IV–B, and Parts IV–C and V, in which THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE STEVENS join.

This case presents issues concerning the constitutional limitations, if any, upon the payment, required as a condition of employment, of dues by a nonmember to a union in the public sector.

I

Michigan's Public Employment Relations Act (Act), Mich. Comp. Laws § 423.201 *et seq.* (1978), provides that a duly selected union shall serve as the exclusive collective-bargaining representative of public employees in a particular bargaining unit.[1] The Act, which applies to faculty members of a public educational institution in Michigan, permits a union and a government employer to enter into an "agency-shop" arrangement under which employees within the bargaining unit who decline to become members of the union are compelled to pay a "service fee" to the union.[2]

---

tional Labor Policy by *Michael E. Avakian* and *Robert F. Gore;* for the Pacific Legal Foundation et al. by *Ronald A. Zumbrun, Anthony T. Caso,* and *Sharon L. Browne;* and for the Public Service Research Council, Inc., by *Edwin Vieira, Jr.*

[1] The statute provides:

"Representatives designated or selected for purposes of collective bargaining by the majority of the public employees in a unit appropriate for such purposes, shall be the exclusive representative of all the public employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment or other conditions of employment, and shall be so recognized by the public employer . . . ." Mich. Comp. Laws § 423.211 (1978).

[2] The statute reads:

"[N]othing in this act or any in any law of this state shall preclude a public employer from making an agreement with an exclusive bargaining rep-

Respondent Ferris Faculty Association (FFA), an affiliate of the Michigan Education Association (MEA) and the National Education Association (NEA), serves, pursuant to this provision, as the exclusive bargaining representative of the faculty of Ferris State College in Big Rapids, Mich. Ferris is a public institution established under the Michigan Constitution and is funded by the State. See Mich. Const., Art. VIII, § 4. Since 1975, the FFA and Ferris have entered into successive collective-bargaining agreements containing agency-shop provisions. Those agreements were the fruit of negotiations between the FFA and respondent Board of Control, the governing body of Ferris. See Mich. Comp. Law § 390.802 (1988).

Subsequent to this Court's decision in *Abood* v. *Detroit Board of Education*, 431 U. S. 209 (1977), in which the Court upheld the constitutionality of the Michigan agency-shop provision and outlined permissible uses of the compelled fee by public-employee unions, Ferris proposed, and the FFA agreed to, the agency-shop arrangement at issue here. That agreement required all employees in the bargaining unit who did not belong to the FFA to pay a service fee equivalent to the amount of dues required of a union member.[3] Of the

resentative as defined in section 11 [§ 423.211] to require as a condition of employment that all employees in the bargaining unit pay to the exclusive bargaining representative a service fee equivalent to the amount of dues uniformly required of members of the exclusive bargaining representative . . . ." § 423.210.

[3] The agency-shop provision of the collective-bargaining agreement for 1981–1984 provided in pertinent part:

"A. Each employee covered by the negotiated Agreement between the Board of Control of Ferris State College and the Ferris Faculty Association (Dated November 19, 1981) shall, as a condition of employment, on or before thirty-one (31) days from the date of commencement of professional duties or July 1, 1981, whichever is later, join the Ferris Faculty Association or pay a service fee to the Association equivalent to the amount of dues uniformly required of members of the Ferris Faculty Association, less any amounts not permitted by law; provided, however, that the bargaining unit member may authorize payroll deduction for such fee. In the event that a

$284 service fee for 1981–1982, the period at issue, $24.80 went to the FFA, $211.20 to the MEA, and $48 to the NEA.

Petitioners were members of the Ferris faculty during the period in question and objected to certain uses by the unions of their service fees. Petitioners instituted this action, pursuant to Rev. Stat. §§ 1979–1981, 42 U. S. C. §§ 1983, 1985, 1986, in the United States District Court for the Western District of Michigan, claiming that the use of their fees for purposes other than negotiating and administering a collective-bargaining agreement with the Board of Control violated rights secured to them by the First and Fourteenth Amendments to the United States Constitution. Petitioners also claimed that the procedures implemented by the unions to determine and collect service fees were inadequate.

After a 12-day bench trial, the District Court issued its opinion holding that certain union expenditures were chargeable to petitioners, that certain other expenditures were not chargeable as a matter of law, and that still other expenditures were not chargeable because the unions had failed to sustain their burden of proving that the expenditures were made for chargeable activities. 643 F. Supp. 1306 (1986).

Following a partial settlement, petitioners took an appeal limited to the claim that the District Court erred in holding

---

bargaining unit member shall not pay such service fee directly to the Association or authorize payment through payroll deduction, the College shall, at the request of the Association, deduct the service fee from the bargaining unit member's salary and remit the same to the Association under the procedure provided below.

.        .        .        .        .

"D. Bargaining unit members paying the service fee provided for herein or whose service fees have been deducted by the College from their salaries may object to the use of their service fee for matters not permitted by law. The procedure for making such objections is that officially adopted by the Association. A copy of the Association policy will be provided by the Association upon a request of a bargaining unit member." Record, Union Defendants' Exh. I, § 2.6; see 643 F. Supp. 1306, 1308, n. 3 (WD Mich. 1986).

that the costs of certain disputed union activities were constitutionally chargeable to the plaintiff faculty members. Specifically, petitioners objected to the District Court's conclusion that the union constitutionally could charge them for the costs of (1) lobbying and electoral politics; (2) bargaining, litigation, and other activities on behalf of persons not in petitioners' bargaining unit; (3) public-relations efforts; (4) miscellaneous professional activities; (5) meetings and conventions of the parent unions; and (6) preparation for a strike which, had it materialized, would have violated Michigan law.

The Court of Appeals, with one judge dissenting in large part, affirmed. 881 F. 2d 1388 (CA6 1989). After reviewing this Court's cases in the area, the court concluded that each of the challenged activities was sufficiently related to the unions' duties as the exclusive bargaining representative of petitioners' unit to justify compelling petitioners to assist in subsidizing it. The dissenting judge concurred with respect to convention expenses but disagreed with the majority's resolution of the other items challenged. *Id.*, at 1394. Because of the importance of the issues, we granted certiorari. 496 U. S. 924 (1990).

## II

This is not our first opportunity to consider the constitutional dimensions of union-security provisions such as the agency-shop agreement at issue here. The Court first addressed the question in *Railway Employes v. Hanson*, 351 U. S. 225 (1956), where it recognized the validity of a "union-shop" agreement authorized by § 2 Eleventh of the Railway Labor Act (RLA), as amended, 64 Stat. 1238, 45 U. S. C. § 152 Eleventh, as applied to private employees. As with the Michigan statute we consider today, the RLA provision at issue in *Hanson* was permissive in nature. It was more expansive than the Michigan Act, however, because the challenged RLA provision authorized an agreement that com-

pelled union membership, rather than simply the payment of a service fee by a nonmember employee.

Finding that the concomitants of compulsory union membership authorized by the RLA extended only to financial support of the union in its collective-bargaining activities, the Court determined that the challenged arrangement did not offend First or Fifth Amendment values. It cautioned, however: "If 'assessments' are in fact imposed for purposes not germane to collective bargaining, a different problem would be presented." 351 U. S., at 235 (footnote omitted). It further emphasized that the Court's approval of the statutorily sanctioned agreement did not extend to cases in which compelled membership is used "as a cover for forcing ideological conformity or other action in contravention of the First Amendment." *Id.*, at 238.

*Hanson* did not directly concern the extent to which union dues collected under a governmentally authorized union-shop agreement may be utilized in support of ideological causes or political campaigns to which reluctant union members are opposed. The Court addressed that issue under the RLA in *Machinists* v. *Street*, 367 U. S. 740 (1961). Unlike *Hanson*, the record in *Street* was replete with detailed information and specific factual findings that the union dues of dissenting employees had been used for political purposes. Recognizing that, in enacting § 2 Eleventh of the RLA, Congress sought to protect the expressive freedom of dissenting employees while promoting collective representation, the *Street* Court construed the RLA to deny unions the authority to expend dissenters' funds in support of political causes to which those employees objected.

Two years later in *Railway Clerks* v. *Allen*, 373 U. S. 113 (1963), another RLA case, the Court reaffirmed that holding. It emphasized the important distinction between a union's political expenditures and "those germane to collective bargaining," with only the latter being properly chargeable to dissenting employees under the statute.

Although they are cases of statutory construction, *Street* and *Allen* are instructive in delineating the bounds of the First Amendment in this area as well. Because the Court expressly has interpreted the RLA "to avoid serious doubt of [the statute's] constitutionality," *Street*, 367 U. S., at 749; see *Ellis* v. *Railway Clerks*, 466 U. S. 435, 444 (1984), the RLA cases necessarily provide some guidance regarding what the First Amendment will countenance in the realm of union support of political activities through mandatory assessments. Specifically, those cases make clear that expenses that are relevant or "germane" to the collective-bargaining functions of the union generally will be constitutionally chargeable to dissenting employees. They further establish that, at least in the private sector, those functions do not include political or ideological activities.

It was not until the decision in *Abood* that this Court addressed the constitutionality of union-security provisions in the public-employment context. There, the Court upheld the same Michigan statute which is before us today against a facial First Amendment challenge. At the same time, it determined that the claim that a union has utilized an individual agency-shop agreement to force dissenting employees to subsidize ideological activities could establish, upon a proper showing, a First Amendment violation. In so doing, the Court set out several important propositions:

First, it recognized that "[t]o compel employees financially to support their collective-bargaining representative has an impact upon their First Amendment interests." 431 U. S., at 222. Unions traditionally have aligned themselves with a wide range of social, political, and ideological viewpoints, any number of which might bring vigorous disapproval from individual employees. To force employees to contribute, albeit indirectly, to the promotion of such positions implicates core First Amendment concerns. See, *e. g.*, *Wooley* v. *Maynard*, 430 U. S. 705, 714 (1977) ("[T]he right of freedom of thought protected by the First Amendment against state ac-

tion includes both the right to speak freely and the right to refrain from speaking at all").

Second, the Court in *Abood* determined that, as in the private sector, compulsory affiliation with, or monetary support of, a public-employment union does not, without more, violate the First Amendment rights of public employees. Similarly, an employee's free speech rights are not unconstitutionally burdened because the employee opposes positions taken by a union in its capacity as collective-bargaining representative. "[T]he judgment clearly made in *Hanson* and *Street* is that such interference as exists is constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress." 431 U. S., at 222.

In this connection, the Court indicated that the considerations that justify the union shop in the private context—the desirability of labor peace and eliminating "free riders"—are equally important in the public-sector workplace. Consequently, the use of dissenters' assessments "for the purposes of collective bargaining, contract administration, and grievance adjustment," *id.*, at 225–226, approved under the RLA, is equally permissible when authorized by a State vis-à-vis its own workers.

Third, the Court established that the constitutional principles that prevent a State from conditioning public employment upon association with a political party, see *Elrod* v. *Burns*, 427 U. S. 347 (1976) (plurality opinion), or upon professed religious allegiance, see *Torcaso* v. *Watkins*, 367 U. S. 488 (1961), similarly prohibit a public employer "from requiring [an employee] to contribute to the support of an ideological cause he may oppose as a condition of holding a job" as a public educator. 431 U. S., at 235.

The Court in *Abood* did not attempt to draw a precise line between permissible assessments for public-sector collective-bargaining activities and prohibited assessments for ideological activities. It did note, however, that, while a similar line

must be drawn in the private sector under the RLA, the distinction in the public sector may be "somewhat hazier." *Id.*, at 236. This is so because the "process of establishing a written collective-bargaining agreement prescribing the terms and conditions of public employment may require not merely concord at the bargaining table, but subsequent approval by other public authorities; related budgetary and appropriations decisions might be seen as an integral part of the bargaining process." *Ibid.*

Finally, in *Ellis*, the Court considered, among other issues, a First Amendment challenge to the use of dissenters' funds for various union expenses including union conventions, publications, and social events. Recognizing that by allowing union-security arrangements at all, it has necessarily countenanced a significant burdening of First Amendment rights, it limited its inquiry to whether the expenses at issue "involve[d] *additional* interference with the First Amendment interests of objecting employees, and, if so, whether they are nonetheless adequately supported by a governmental interest." 466 U. S., at 456 (emphasis added).

Applying that standard to the challenged expenses, the Court found all three to be properly supportable through mandatory assessments. The dissenting employees in *Ellis* objected to charges relating to union social functions, not because those activities were inherently expressive or ideological in nature, but purely because they were sponsored by the union. Because employees may constitutionally be compelled to affiliate with a union, the Court found that forced contribution to union social events that were open to all imposed no additional burden on their First Amendment rights. Although the challenged expenses for union publications and conventions were clearly communicative in nature, the Court found them to entail little additional encroachment upon freedom of speech, "and none that is not justified by the governmental interests behind the union shop itself." *Ibid.* See

also *Keller* v. *State Bar of California*, 496 U. S. 1 (1990), and *Communications Workers* v. *Beck*, 487 U. S. 735 (1988).

Thus, although the Court's decisions in this area prescribe a case-by-case analysis in determining which activities a union constitutionally may charge to dissenting employees, they also set forth several guidelines to be followed in making such determinations. *Hanson* and *Street* and their progeny teach that chargeable activities must (1) be "germane" to collective-bargaining activity; (2) be justified by the government's vital policy interest in labor peace and avoiding "free riders"; and (3) not significantly add to the burdening of free speech that is inherent in the allowance of an agency or union shop.

### III

In arguing that these principles exclude the charges upheld by the Court of Appeals, petitioners propose two limitations on the use by public-sector unions of dissenters' contributions. First, they urge that they may not be charged over their objection for lobbying activities that do not concern legislative ratification of, or fiscal appropriations for, their collective-bargaining agreement. Second, as to nonpolitical expenses, petitioners assert that the local union may not utilize dissenters' fees for activities that, though closely related to collective bargaining generally, are not undertaken directly on behalf of the bargaining unit to which the objecting employees belong. We accept the former proposition but find the latter to be foreclosed by our prior decisions.

### A

The Court of Appeals determined that unions constitutionally may subsidize lobbying and other political activities with dissenters' fees so long as those activities are "'pertinent to the duties of the union as a bargaining representative.'" 881 F. 2d, at 1392, quoting *Robinson* v. *New Jersey*, 741 F. 2d 598, 609 (CA3 1984), cert. denied, 469 U. S. 1228 (1985). In reaching this conclusion, the court relied upon the inherently

political nature of salary and other workplace decisions in public employment. "To represent their members effectively," the court concluded, "public sector unions must necessarily concern themselves not only with negotiations at the bargaining table but also with advancing their members' interests in legislative and other 'political' arenas." 881 F. 2d, at 1392.

This observation is clearly correct. Public-sector unions often expend considerable resources in securing ratification of negotiated agreements by the proper state or local legislative body. See Note, Union Security in the Public Sector: Defining Political Expenditures Related to Collective Bargaining, 1980 Wis. L. Rev. 134, 150–152. Similarly, union efforts to acquire appropriations for approved collective-bargaining agreements often serve as an indispensable prerequisite to their implementation. See Developments in the Law: Public Employment, 97 Harv. L. Rev. 1611, 1732–1733 (1984). It was in reference to these characteristics of public employment that the Court in *Abood* discussed the "somewhat hazier" line between bargaining-related and purely ideological activities in the public sector. 431 U. S., at 236. The dual roles of government as employer and policymaker in such cases make the analogy between lobbying and collective bargaining in the public sector a close one.

This, however, is not such a case. Where, as here, the challenged lobbying activities relate not to the ratification or implementation of a dissenter's collective-bargaining agreement, but to financial support of the employee's profession or of public employees generally, the connection to the union's function as bargaining representative is too attenuated to justify compelled support by objecting employees.

We arrive at this result by looking to the governmental interests underlying our acceptance of union-security arrangements. We have found such arrangements to be justified by the government's interest in promoting labor peace and avoiding the "free-rider" problem that would otherwise ac-

company union recognition. *Teachers* v. *Hudson*, 475 U. S. 292, 302–303 (1986); *Abood*, 431 U. S., at 224. Neither goal is served by charging objecting employees for lobbying, electoral, and other political activities that do not relate to their collective-bargaining agreement.

Labor peace is not especially served by allowing such charges because, unlike collective-bargaining negotiations between union and management, our national and state legislatures, the media, and the platform of public discourse are public fora open to all. Individual employees are free to petition their neighbors and government in opposition to the union which represents them in the workplace. Because worker and union cannot be said to speak with one voice, it would not further the cause of harmonious industrial relations to compel objecting employees to finance union political activities as well as their own.

Similarly, while we have endorsed the notion that nonunion workers ought not be allowed to benefit from the terms of employment secured by union efforts without paying for those services, the so-called "free-rider" concern is inapplicable where lobbying extends beyond the effectuation of a collective-bargaining agreement. The balancing of monetary and other policy choices performed by legislatures is not limited to the workplace but typically has ramifications that extend into diverse aspects of an employee's life.

Perhaps most important, allowing the use of dissenters' assessments for political activities outside the scope of the collective-bargaining context would present "additional interference with the First Amendment interests of objecting employees." *Ellis*, 466 U. S., at 456. There is no question as to the expressive and ideological content of these activities. Further, unlike discussion by negotiators regarding the terms and conditions of employment, lobbying and electoral speech are likely to concern topics about which individuals hold strong personal views. Although First Amendment protection is in no way limited to controversial topics or emotionally

charged issues, see *Winters* v. *New York*, 333 U. S. 507, 510 (1948); *Buckley* v. *Valeo*, 424 U. S. 1, 14 (1976); *Abood*, 431 U. S., at 231, and n. 28, the extent of one's disagreement with the subject of compulsory speech is relevant to the degree of impingement upon free expression that compulsion will effect.

The burden upon freedom of expression is particularly great where, as here, the compelled speech is in a public context. By utilizing petitioners' funds for political lobbying and to garner the support of the public in its endeavors, the union would use each dissenter as "an instrument for fostering public adherence to an ideological point of view he finds unacceptable." *Maynard*, 430 U. S., at 715. The First Amendment protects the individual's right of participation in these spheres from precisely this type of invasion. Where the subject of compelled speech is the discussion of governmental affairs, which is at the core of our First Amendment freedoms, *Roth* v. *United States*, 354 U. S. 476, 484 (1957); *Mills* v. *Alabama*, 384 U. S. 214, 218 (1966); *Buckley* v. *Valeo*, 424 U. S., at 14, the burden upon dissenters' rights extends far beyond the acceptance of the agency shop and is constitutionally impermissible.

Accordingly, we hold that the State constitutionally may not compel its employees to subsidize legislative lobbying or other political union activities outside the limited context of contract ratification or implementation.

## B

Petitioners' contention that they may be charged only for those collective-bargaining activities undertaken directly on behalf of their unit presents a closer question. While we consistently have looked to whether nonideological expenses are "germane to collective bargaining," *Hanson*, 351 U. S., at 235, we have never interpreted that test to require a direct relationship between the expense at issue and some tangible benefit to the dissenters' bargaining unit.

We think that to require so close a connection would be to ignore the unified-membership structure under which many unions, including those here, operate. Under such arrangements, membership in the local union constitutes membership in the state and national parent organizations. See 643 F. Supp., at 1308. See also *Cumero* v. *Public Employment Relations Board*, 49 Cal. 3d 575, 603–604, 778 P. 2d 174, 192 (1989) (noting the inherent "close organizational relationship").

The essence of the affiliation relationship is the notion that the parent will bring to bear its often considerable economic, political, and informational resources when the local is in need of them. Consequently, that part of a local's affiliation fee which contributes to the pool of resources potentially available to the local is assessed for the bargaining unit's protection, even if it is not actually expended on that unit in any particular membership year.

The Court recognized as much in *Ellis*. There it construed the RLA to allow the use of dissenters' funds to help defray the costs of the respondent union's national conventions. It reasoned that "if a union is to perform its statutory functions, it must maintain its corporate or associational existence, must elect officers to manage and carry on its affairs, and may consult its members about overall bargaining goals and policy." 466 U. S., at 448. We see no reason why analogous public-sector union activities should be treated differently.[4]

---

[4] The Michigan Employment Relations Commission—the state agency responsible for administering the Act—has reached the same conclusion in applying the statute to local affiliates of the MEA and the NEA. In determining that the involvement of the NEA and the MEA in local contract administration and grievance adjustment was a legitimate aspect of the local's service fee, the agency explained that "to restrict chargeability to only those activities directly relating to the local bargaining unit is to totally ignore the fact of affiliation." *Bridgeport-Spaulding Community Schools*, 1986 MERC Op. 1024, 1057. See also *Garden City School District*, 1978 MERC Op. 1145, 1155–1156. While the agency's conclusions of law are

We therefore conclude that a local bargaining represent-
ative may charge objecting employees for their pro rata
share of the costs associated with otherwise chargeable activ-
ities of its state and national affiliates, even if those activities
were not performed for the direct benefit of the objecting em-
ployees' bargaining unit.   This conclusion, however, does not
serve to grant a local union *carte blanche* to expend dissent-
ers' dollars for bargaining activities wholly unrelated to the
employees in their unit.   The union surely may not, for ex-
ample, charge objecting employees for a direct donation or
interest-free loan to an unrelated bargaining unit for the pur-
pose of promoting employee rights or unionism generally.
Further, a contribution by a local union to its parent that is
not part of the local's responsibilities as an affiliate but is in
the nature of a charitable donation would not be chargeable
to dissenters.   There must be some indication that the pay-
ment is for services that may ultimately inure to the benefit
of the members of the local union by virtue of their member-
ship in the parent organization.   And, as always, the union
bears the burden of proving the proportion of chargeable ex-
penses to total expenses.   *Teachers* v. *Hudson*, 475 U. S., at
306; *Abood*, 431 U. S., at 239–240, n. 40; *Railway Clerks* v.
*Allen*, 373 U. S., at 122.   We conclude merely that the union
need not demonstrate a direct and tangible impact upon the
dissenting employee's unit.

### C

JUSTICE SCALIA would find "implicit in our cases since
*Street*," the rule that "to be constitutional, a charge must *at
least* be incurred in performance of the union's statutory du-
ties." *Post*, at 558.   As the preceding discussion indicates,
we reject this reading of our cases.   This Court never has
held that the First Amendment compels such a requirement
and our prior decisions cannot reasonably be construed to

without effect upon this Court, we find persuasive its factual findings
regarding the structure and operation of labor organizations within its
jurisdiction.

support his stated proposition. See, *e. g.*, *Ellis*, 466 U. S., at 456 ("Petitioners may feel that their money is not being well-spent, but that does not mean they have a First Amendment complaint"); see also *Keller* v. *State Bar of California*, 496 U. S. 1 (1990) (distinguishing between statutory and constitutional duties in the context of integrated state bar membership).

Even if viewed merely as a prophylactic rule for enforcing the First Amendment in the union-security context, JUSTICE SCALIA's approach ultimately must be rejected. As the relevant provisions of the Michigan Act illustrate,[5] state labor laws are rarely precise in defining the duties of public-sector unions to their members. Indeed, it is reasonable to assume that the Michigan provisions relating to collective-bargaining duties were purposefully drafted in broad terms so as to provide unions the flexibility and discretion necessary to accommodate the needs of their constituents. Here, as in the RLA context, "[t]he furtherance of the common cause leaves some leeway for the leadership of the group." *Street*, 367 U. S., at 778 (Douglas, J., concurring), quoted in *Abood*, 431 U. S., at 222–223.

---

[5] As relevant here, § 11 of the Act provides:

"Representatives designated or selected for purposes of collective bargaining by the majority of the public employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the public employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment or other conditions of employment, and shall be so recognized by the public employer . . . ." Mich. Comp. Laws § 423.211 (1978).

Section 15 provides in pertinent part:

"[T]o bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract, ordinance or resolution incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession." § 423.214.

Consequently, the terms of the Act provide a poor criterion for determining which charges violate the First Amendment rights of dissenting employees. The broad language of the Act does not begin to explain which of the specific activities at issue here fall within the union's collective-bargaining function as contemplated by our cases. Far from providing a bright-line standard, JUSTICE SCALIA's "statutory duties" test fails to afford courts and litigants the guidance necessary to make these particularized distinctions.

More important, JUSTICE SCALIA's rigid approach fails to acknowledge the practicalities of the complex interrelationship between public employers, employees, unions, and the public. The role of an effective representative in this context often encompasses responsibilities that extend beyond those specifically delineated in skeletal state labor law statutes. See *Abood*, 431 U. S., at 236. That an exclusive bargaining representative has gone beyond the bare requirements of the law in representing its constituents through employee contributions does not automatically mean that the Constitution has been violated, at least where the funded activities have not *transgressed* state provisions. "The very nature of the free-rider problem and the governmental interest in overcoming it require that the union have a certain flexibility in its use of compelled funds." *Ellis*, 466 U. S., at 456.

We therefore disagree with JUSTICE SCALIA that any charge that does not relate to an activity expressly authorized by statute is *constitutionally* invalid, irrespective of its impact, or lack thereof, on free expression. In our view, his analysis turns our constitutional doctrine on its head. Instead of interpreting statutes in light of First Amendment principles, he would interpret the First Amendment in light of state statutory law. It seems to us that this proposal bears little relation to the values that the First Amendment was designed to protect. A rule making violations of freedom of speech dependent upon the terms of state employ-

ment statutes would sacrifice sound constitutional analysis for the appearance of administrability.

We turn to the union activities at issue in this case.

IV

A

The Court of Appeals found that the union could constitutionally charge petitioners for the costs of a Preserve Public Education (PPE) program designed to secure funds for public education in Michigan, and that portion of the MEA publication, the Teacher's Voice, which reported these activities. Petitioners argue that, contrary to the findings of the courts below, the PPE program went beyond lobbying activity and sought to affect the outcome of ballot issues and "millages" or local taxes for the support of public schools. Given our conclusion as to lobbying and electoral politics generally, this factual dispute is of little consequence. None of these activities was shown to be oriented toward the ratification or implementation of petitioners' collective-bargaining agreement. We hold that none may be supported through the funds of objecting employees.

B

Petitioners next challenge the Court of Appeals' allowance of several activities that the union did not undertake directly on behalf of persons within petitioners' bargaining unit. This objection principally concerns NEA "program expenditures" destined for States other than Michigan, and the expenses of the Teacher's Voice listed as "Collective Bargaining" and "Litigation." Our conclusion that unions may bill dissenting employees for their share of general collective-bargaining costs of the state or national parent union is dispositive as to the bulk of the NEA expenditures. The District Court found these costs to be germane to collective bargaining and similar support services and we decline to disturb that finding. No greater relationship is necessary in the collective-bargaining context.

This rationale does not extend, however, to the expenses of litigation that does not concern the dissenting employees' bargaining unit or, by extension, to union literature reporting on such activities. While respondents are clearly correct that precedent established through litigation on behalf of one unit may ultimately be of some use to another unit, we find extraunit litigation to be more akin to lobbying in both kind and effect. We long have recognized the important political and expressive nature of litigation. See, e. g., NAACP v. Button, 371 U. S. 415, 431 (1963) (recognizing that for certain groups, "association for litigation may be the most effective form of political association"). Moreover, union litigation may cover a diverse range of areas from bankruptcy proceedings to employment discrimination. See Ellis, 466 U. S., at 453. When unrelated to an objecting employee's unit, such activities are not germane to the union's duties as exclusive bargaining representative. Just as the Court in Ellis determined that the RLA, as informed by the First Amendment, prohibits the use of dissenters' fees for extraunit litigation, ibid., we hold that the Amendment proscribes such assessments in the public sector.

## C

The Court of Appeals determined that the union constitutionally could charge petitioners for certain public relations expenditures. In this connection, the court said: "Public relations expenditures designed to enhance the reputation of the teaching profession . . . are, in our opinion, sufficiently related to the unions' duty to represent bargaining unit employees effectively so as to be chargeable to dissenters." 881 F. 2d, at 1394. We disagree. Like the challenged lobbying conduct, the public relations activities at issue here entailed speech of a political nature in a public forum. More important, public speech in support of the teaching profession generally is not sufficiently related to the union's collective-bargaining functions to justify compelling dissenting employees to support it. Expression of this kind extends beyond

the negotiation and grievance-resolution contexts and imposes a substantially greater burden upon First Amendment rights than do the latter activities.

Nor do we accept the Court of Appeals' comparison of these public relations expenses to the costs of union social activities held in *Ellis* to be chargeable to dissenters. In *Ellis*, the Court found the communicative content of union social activities, if any, to derive solely from the union's involvement in them. 466 U. S., at 456. "Therefore," we reasoned, "the fact that the employee is forced to contribute does not increase the infringement of his First Amendment rights already resulting from the compelled contribution to the union." *Ibid.* The same cannot be said of the public relations charges upheld by the Court of Appeals which covered "informational picketing, media exposure, signs, posters and buttons." 643 F. Supp., at 1313.

### D

The District Court and the Court of Appeals allowed charges for those portions of the Teachers' Voice that concern teaching and education generally, professional development, unemployment, job opportunities, award programs of the MEA, and other miscellaneous matters. Informational support services such as these are neither political nor public in nature. Although they do not directly concern the members of petitioners' bargaining unit, these expenditures are for the benefit of all and we discern no additional infringement of First Amendment rights that they might occasion. In short, we agree with the Court of Appeals that these expenses are comparable to the *de minimis* social activity charges approved in *Ellis*. See 466 U. S., at 456.

### E

The Court of Appeals ruled that the union could use the fees of objecting employees to send FFA delegates to the MEA and the NEA conventions and to participate in the 13E Coordinating Council, another union structure. Petitioners

challenge that determination and argue that, unlike the national convention expenses found to be chargeable to dissenters in *Ellis*, the meetings at issue here were those of affiliated parent unions rather than the local, and therefore do not relate exclusively to petitioners' unit.

We need not determine whether petitioners could be commanded to support all the expenses of these conventions. The question before the Court is simply whether the unions may constitutionally require petitioners to subsidize the participation in these events of delegates from the local. We hold that they may. That the conventions were not solely devoted to the activities of the FFA does not prevent the unions from requiring petitioners' support. We conclude above that the First Amendment does not require so close a connection. Moreover, participation by members of the local in the formal activities of the parent is likely to be an important benefit of affiliation. This conclusion is supported by the District Court's description of the 13E Coordinating Council meeting as an event at which "bargaining strategies and representational policies are developed for the UniServ unit composed of the Ferris State College and Central Michigan University bargaining units." 643 F. Supp., at 1326. As was held in *Ellis*, "[c]onventions such as those at issue here are normal events . . . and seem to us to be essential to the union's discharge of its duties as bargaining agent." 466 U. S., at 448–449.

### F

The chargeability of expenses incident to preparation for a strike which all concede would have been illegal under Michigan law, Mich. Comp. Laws § 423.202 (1979), is a provocative question. At the beginning of the 1981–1982 fiscal year, the FFA and Ferris were engaged in negotiating a new collective-bargaining agreement. The union perceived these efforts to be ineffective and began to prepare a "job action" or, in more familiar terms, to go out on strike. These prepa-

rations entailed the creation by the FFA and the MEA of a "crisis center" or "strike headquarters." The District Court found that, "whatever label is attached to this facility, prior to a strike it serves as a meeting place for the local's membership, a base from which tactical activities such as informational picketing can be conducted, and serves to apply additional pressure on the employer by suggesting, whether true or not, that the local is prepared to strike if necessary." 643 F. Supp., at 1313.

Had the FFA actually engaged in an illegal strike, the union clearly could not have charged the expenses incident to that strike to petitioners. We can imagine no legitimate governmental interest that would be served by compelling objecting employees to subsidize activity that the State has chosen to disallow. See *Male* v. *Grand Rapids Education Association*, 98 Mich. App. 742, 295 N. W. 2d 918 (1980) (holding that, under Michigan law, compulsory-service fees cannot include money allocated to the support of public-sector strikes), appeal denied, 412 Mich. 851, 312 N. W. 2d 83 (1981). Similarly, one might expect the State to prohibit unions from using dissenters' funds to threaten or prepare for such conduct. The Michigan Legislature, however, has chosen not to impose such a restriction, and we do not find the First Amendment to require that limitation.

Petitioners can identify no determination by the State of Michigan that mere preparation for an illegal strike is itself illegal or against public policy, and we are aware of none. Further, we accept the rationale provided by the Court of Appeals in upholding these charges that such expenditures fall "within the range of reasonable bargaining tools available to a public sector union during contract negotiations." 881 F. 2d, at 1394. The District Court expressly credited trial testimony by an MEA representative that outward preparations for a potential strike serve as an effective bargaining tool and that only one out of every seven or eight "job action

investigations" actually culminates in a strike. 643 F. Supp., at 1312. The Court of Appeals properly reviewed this finding for clear error. See *Anderson* v. *Bessemer City*, 470 U. S. 564, 575 (1985).

In sum, these expenses are substantively indistinguishable from those appurtenant to collective-bargaining negotiations. The District Court and the Court of Appeals concluded, and we agree, that they aid in those negotiations and inure to the direct benefit of members of the dissenters' unit. Further, they impose no additional burden upon First Amendment rights.[6] The union may properly charge petitioners for those costs.

## V

The judgment of the Court of Appeals is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

[6] That JUSTICE SCALIA's "statutory duties" test is unworkable is evidenced by the fact that he apparently is unwilling to apply it fully to the charges at issue in this case. He agrees with our determination that dissenting employees may be charged for the local's contribution to the collective-bargaining activities of state and national parent associations. Yet the parent organizations are not bound by statute or by contract to provide collective-bargaining support to the local. Nor is the local statutorily required to affiliate with or contribute to its larger parent associations. The Justice concludes, as do we, that there is "no reason to insist that, in order to be chargeable, on-call services for use in the bargaining process be committed by contract rather than by practice and usage." *Post*, at 561. But this conclusion appears to be out of line with his view that dissenters may be charged only for services that the State has *required* the union to provide. Under his analysis, that the benefits of affiliation as a practical matter may *aid* the local union in performing its "statutory duties" should be irrelevant. Thus, he would prohibit charges for strike preparations despite his admission that "visible preparations for a strike [may] strengthen the union's position in negotiations." *Post*, at 562. In our view, this inconsistency highlights the unfeasibility of JUSTICE SCALIA's approach.

JUSTICE MARSHALL, concurring in part and dissenting in part.

The parties in this case dispute the amount that public sector unions may charge as a "service fee" to employees who are not union members. Under an agency-shop provision like the one that covers petitioners, dissenting (*i. e.,* nonunion) employees are generally obliged to share the union's cost of negotiating and administering their collective-bargaining agreement. The key question we confront is whether, consistently with the First Amendment, a union may charge dissenting employees for union activities that are conducted away from the bargaining table but that are also reasonably designed to influence the public employer's position *at* the bargaining table.

The principal opinion concedes that "'[t]o represent their members effectively, . . . public sector unions must necessarily concern themselves not only with negotiations at the bargaining table but also with advancing their members' interests in legislative and other "political" arenas.'" *Ante,* at 520, quoting 881 F. 2d 1388, 1392 (CA6 1989). One would expect endorsement of this proposition to lead the principal opinion, as it led both the Court of Appeals and the District Court below, to include within the petitioners' service fee the costs of (1) lobbying legislators (and, where relevant, voters) to increase funding of the public sector in which petitioners work, namely, education, and (2) a public relations campaign to improve the voters' and the public employer's view of petitioners and their fellow teachers. After all, the extent to which public employees may secure favorable terms in a collective-bargaining agreement depends on the availability of funds in the relevant public sector. Similarly, the more favorable the public attitude toward a bargaining unit's members, the more likely that the public employer will accept a given bargaining proposal.

The principal opinion rejects these reasonable implications of the proposition whose truth it concedes, and thus the

Court today holds that the respondent teachers' unions—the National Education Association (NEA); its state affiliate, the Michigan Education Association (MEA); and a local affiliate, the Ferris Faculty Association (FFA) at Ferris State College—may not assess FFA's dissenting members for the lobbying and public relations expenses I have just described. I respectfully dissent from these two aspects of today's decision.

I also disagree with the Court's decision that the costs of articles printed in MEA's employee journal about union litigation outside petitioners' bargaining unit are not chargeable. The principal opinion requires the MEA to isolate the expense of each such article and to charge it solely to the bargaining unit involved in the particular suit. Neither precedent nor common sense supports this burdensome accounting procedure—particularly since the publication costs at issue are *de minimis*.

In Parts I, II, and III, respectively, I explain in more detail my disagreement with the Court's disposition of these three disputed charges and in particular with the analysis of these charges in the principal opinion. I otherwise join in Parts I, II, III–B, and C, and IV–B (except the final paragraph), D, E, and F of the principal opinion.

## I

I consider first the costs of lobbying. The principal opinion concludes that the service fee charged to petitioners may not constitutionally include the lobbying expenses incurred by respondents, because these expenses (1) are not germane to a union's collective-bargaining responsibilities, (2) do not serve either of the government interests that justify an agency shop, and (3) effect an infringement of petitioners' First Amendment associational and speech freedoms beyond that which is inherent in the agency shop. I believe that the principal opinion errs in each of these conclusions, which I discuss in turn below.

## A

The principal opinion errs most, in my judgment, in creating a very narrow rule for testing the constitutional acceptability of charges for lobbying activities. It is common ground that such activities are not chargeable unless they are "'germane' to collective-bargaining activity," *ante*, at 519; however, although JUSTICE BLACKMUN's opinion for the Court applies this standard to several of the charges before us in the flexible manner that our precedents require, see *ante*, at 527, 529–532, Parts IV–B (first paragraph), D, E, and F, elsewhere JUSTICE BLACKMUN's opinion fashions and applies to lobbying expenses a new and unjustifiably restrictive germaneness standard.

The only true lobbying expense that the District Court upheld as chargeable in this case was $150 incurred by the FFA (out of annual expenditures of more than $18,000) in support of a Preserve Public Education (PPE) Conference. The District Court found that "the PPE program was directed at securing funding for public education in Michigan," and concluded that, "[i]n a public sector bargaining unit where funding for employment positions, salaries and benefits is conditioned upon legislative appropriations, such lobbying is directly related to the statutory duties of the exclusive representative." 643 F. Supp. 1306, 1326 (WD Mich. 1986). The Court of Appeals endorsed this reasoning. See 881 F. 2d, at 1392. The principal opinion however, comes to a different conclusion, offering the following new standard for the chargeability of union activities:

> "Where . . . the challenged lobbying activities relate not to the ratification or implementation of a dissenter's collective-bargaining agreement, but to financial support of the employee's profession or of public employees generally, the connection to the union's function as bargaining representative is too attenuated to justify compelled support by objecting employees." *Ante,* at 520.

The key phrase in this new standard is the requirement that a chargeable activity relate to *"ratification* or implementation" of a collective-bargaining agreement. That language departs dramatically from our prior decisions, which uniformly refer to *negotiation* and administration as the touchstones for determining chargeability. See, *e. g.*, *Ellis* v. *Railway Clerks*, 466 U. S. 435, 448 (1984); *Abood* v. *Detroit Board of Education*, 431 U. S. 209, 221 (1977); *Machinists* v. *Street*, 367 U. S. 740, 760, 768 (1961). In *Abood*, we not only defined the scope of chargeable activities with reference to *negotiation* of collective-bargaining agreements but also explained why the negotiating process was particularly broad in the public sector:

> "The process of establishing a written collective-bargaining agreement prescribing the terms and conditions of public employment may require not merely concord at the bargaining table, but subsequent approval by other public authorities; *related budgetary and appropriations decisions might be seen as an integral part of the bargaining process."* *Abood*, 431 U. S., at 236 (emphasis added).

See also *id.*, at 228 ("negotiating a final agreement . . . may be severely limited by statutory restrictions, by the need for the approval of a higher executive authority or a legislative body, *or by the commitment of budgetary decisions* of critical importance to others") (emphasis added).

Thus, we recognized in *Abood* that several different agents, including administrators and elected legislators, comprise the "employer" with whom public sector unions negotiate. *Ibid.* This significant difference between the relatively unified, authoritative management voice in the private sector and a public sector management voice that is fragmented and only partially authoritative induces responsible unions to "see[k] out a higher level of authority with the purpose of influencing the outcome of negotiations." J. Begin & E. Beal, The Practice of Collective Bargaining 441 (7th ed.

1985). Cf. *Abood, supra,* at 229–230 ("'The uniqueness of public employment . . . is in the special character of the employer'"), quoting Summers, Public Sector Bargaining: Problems of Governmental Decisionmaking, 44 U. Cin. L. Rev. 669, 670 (1975). Respondents' PPE program aimed at just such "a higher level of authority" in the hope of "influencing the outcome of negotiations."

The principal opinion overlooks the crucial language in *Abood,* our major precedent concerning public sector union security, and therefore finds nonchargeable union lobbying that is directed toward the very "budgetary and appropriations decisions" that *Abood* found to be a plausible component of the negotiating process. Such lobbying is nonchargeable, the opinion declares, because it lies "outside the limited context of contract *ratification* or implementation." *Ante,* at 522 (emphasis added). The difference between "ratification" and "negotiation" appears to be solely temporal. Presumably, in other words, the opinion would permit lobbying for an education appropriations bill that is necessary to fund an existing collective-bargaining agreement, but it would not permit lobbying for the same level of funding in advance of the agreement, even though securing such funding often might be necessary to persuade the relevant administrators to enter into the agreement. I see no justification for this distinction.

The principal opinion defends its substitution of "ratification" for "negotiation" in our germaneness standard by arguing that inclusion of PPE costs within dissenting employees' service fees would not serve either of the governmental interests underlying the agency shop, namely (1) preventing "free riding" and (2) ensuring labor peace. Neither argument persuades.

B

*Preventing Free Riding:* As we have previously explained in upholding union or agency shop legislation, such arrangements "counterac[t] the incentive that employees might otherwise have to become 'free riders'—to refuse to contribute

to the union while obtaining benefits of union representation that necessarily accrue to all employees." *Abood* v. *Detroit Board of Education, supra,* at 222. JUSTICE BLACKMUN's opinion rejects the possibility that dissenting teachers who are exempted from sharing lobbying costs might benefit unfairly from an expanded education budget. "[T]he so-called 'free-rider' concern," we are told, "is inapplicable where lobbying extends beyond the effectuation of a collective-bargaining agreement," because "[t]he balancing of monetary and other policy choices performed by legislatures is not limited to the workplace but typically has ramifications that extend into diverse aspects of an employee's life." *Ante,* at 521.

The argument here seems to be that, when a legislature increases funding for education, it often makes a compensating reduction—which a dissenting employee may oppose—in some other area of the budget. The principal opinion may be arguing that the dissenting employee has not incurred a net benefit from, and therefore cannot be termed a "free rider" on, the union's lobbying campaign. This argument proves too much, however, since it could just as readily be applied to the *ratification* of a public sector labor contract. If a union secures a significant pay increase in a new collective-bargaining agreement, the legislature that ratifies that agreement may well feel constrained to make some offsetting reduction in funding for other programs. Here, again, the employees who benefit from the new agreement may nevertheless disagree with the trade-off the legislature has chosen. The fact that state budgets often operate within such a zero-sum framework does not excuse members of a bargaining unit from sharing the union's cost of obtaining benefits for them. I conclude that the traditional concern for preventing "free riding" is no less applicable here than in our prior cases. If the PPE lobbying program succeeds in generating higher funding for professors and teachers in the public sector, petitioners will surely benefit along with the other members of their bargaining unit and ought to help bear the costs.

*Promoting Labor Peace:* The principal opinion fares no better in its suggestion that charging dissenting employees for the PPE program fails to advance the other governmental interest that underlies the agency shop, namely, promotion of labor peace. We have previously recognized that Michigan's agency-shop provision serves to prevent "confusion and conflict that could arise if rival teachers' unions . . . each sought to obtain the employer's agreement." *Abood,* 431 U. S., at 224. A corollary of this principle of unitary representation, of course, is that the sole representative must be able to speak for all of the employees whom it represents. Thus, when a union decides that the bargaining units it represents are best served by a campaign to increase educational funding, it is entitled to pursue that goal with resources commensurate with its status as sole representative.

The principal opinion argues that "[l]abor peace is not especially served by allowing . . . charges [for union lobbying]," *ante,* at 521, because dissenting employees are free to lobby legislatures on their own in support of conflicting goals. This argument confuses labor peace with employee unanimity. There will always be bargaining unit members, in both the public and private sectors, who disagree with union leaders and who say so publicly. Such action has never been deemed inconsistent with labor peace. The interest in labor peace requires only that, when a union deals with management in its official capacity as collective-bargaining representative, it be allowed to speak with one voice and with the appropriate strength that reflects financial support of all unit members. I conclude that this interest is advanced by the inclusion of PPE costs in the fees charged to petitioners.

## C

The principal opinion offers a final argument to show that charging dissenters for PPE costs violates the First Amendment. As the opinion observes, even if a given cost is found to be "germane" to a union's collective-bargaining duties and

to further the two governmental interests that inform the scope of germaneness, the cost may still be nonchargeable if it involves "additional infringement of First Amendment rights beyond that already accepted [in the union shop arrangement], and . . . that is not justified by the governmental interests behind the union shop itself." *Ellis*, 466 U. S., at 456.

Unfortunately, the opinion never examines whether the PPE program causes this "additional infringement of First Amendment rights" or whether such infringement may be "justified." Instead, it simply states in conclusory terms that *all* lobbying costs must be excluded since lobbying occurs "in a public context" *ante*, at 522, and "is likely to concern topics about which individuals hold strong personal views," *ante*, at 521. This analysis is scarcely faithful to the particularized inquiry the Court commended in *Ellis*. In that case, we examined whether the costs of union social activities, publications, and conventions did impose such "additional infringement" and concluded that they did not. I believe the same answer is compelled with respect to the PPE costs at issue here. As noted, the purpose of the PPE program was to increase funding for public education. Obviously, there is considerable overlap between that goal and the union's objectives in a collective-bargaining session, which typically include increased funding for teachers' salaries, benefits, and perhaps work environments. To be sure, those who advocate greater spending on all educational programs make a broader statement than those who merely propose higher wages and benefits for educational personnel. In that sense, the PPE program might be said to effect an "additional interference with the First Amendment interests of objecting employees," *Ellis*, 466 U. S., at 456, beyond what "we have already countenanced" by "allowing the union shop at all," *id.*, at 455. However, this additional interference corresponds to a crucial feature of the public sector's decisional process: legislatures often make budgetary choices at the broad level

of functional categories (such as education), rather than at the level of specific items within those categories (such as salaries and benefits). As I have already noted, moreover, those budgetary decisions may be crucial to the union's ability to secure a particular collective-bargaining agreement. I conclude, therefore, that whatever additional burden on First Amendment rights may arise from inclusion of PPE costs within service fees is "justified by the governmental interests behind the union shop itself." *Id.*, at 456.

In reaching a contrary conclusion, the principal opinion relies principally on *Wooley* v. *Maynard*, 430 U. S. 705 (1977), in which we struck down a state criminal law forbidding drivers to obscure the state motto, "Live Free or Die," on their license plates. We found that this law violated the First Amendment by improperly forcing a citizen to become "an instrument for fostering public adherence to an ideological point of view he finds unacceptable." *Id.*, at 715.

The opinion's attempted analogy between the coercion at issue in *Wooley* and the requirement that petitioners bear their fair share of the PPE costs is wholly unpersuasive. The requirement that a dissenting member contribute to the PPE message is not likely to violate a dissenter's "right to refrain from speaking." *Wooley, supra,* at 714. In *Wooley,* it was not sufficient that the complaining party disagreed with the government's message. What was dispositive was the fact that the government was forcing the citizens themselves to be "courier[s]" of the message with which they disagreed, see *id.*, at 717, thereby conscripting their expressive capacities in service of the government's message.

Petitioners' expressive capacities have not been conscripted. Rather, petitioners have simply been required to pay a pro rata share of lobbying costs incurred by a union representative, chosen pursuant to majority vote, who deemed the costs worthwhile in pursuing collective-bargaining goals. Indeed, I find a much closer analogy to the present case in our decisions rejecting claims by taxpayers who disagree

with Government spending policies. We have held in that context that First Amendment rights do not entitle dissenting citizens to withhold their share of payments for activities that Congress has approved. See, *e. g., United States* v. *Lee*, 455 U. S. 252 (1982) (Amish must pay social security taxes, even though doing so violates their religious beliefs). For much the same reason, I see no First Amendment violation in requiring petitioners to support decisions made on their behalf by duly elected representatives and in pursuit of the *limited* powers delegated to those representatives.

## D

A final disputed charge that petitioners place under the heading of "lobbying" is not really a lobbying cost at all. Petitioners object to contributing to that portion of MEA's employee publication (the Teacher's Voice) that informed employees—like petitioners—about lobbying activities that MEA and NEA had undertaken. The principal opinion does not discuss these reporting charges separately since it finds that *no* expenses relating to lobbying are chargeable. Since I find otherwise, I simply note that, like the PPE program itself, the cost of articles reporting on that program (and on other similar efforts to increase funding or influence benefits for teachers) should be chargeable. What this Court said of the Railway Labor Act (RLA), 44 Stat. 577, as amended, 45 U. S. C. § 151 *et seq.*, in *Ellis* would seem to apply equally to the Michigan labor statute at issue here: "the Act surely allows [the union] to charge objecting employees for reporting to them about those activities it can charge them for doing." *Ellis, supra,* at 451. The District Court appears to have approved only the charges for reports on lobbying that was "germane to the union's duties as bargaining representative," see 643 F. Supp., at 1324, 1328, which principally involved educational funding. See App. 204–217. These charges therefore should be upheld.

## II

The second category of expenditures that I believe the Court incorrectly excludes from service fees is the costs of the local union's public relations campaign. It appears that FFA launched this campaign (for the modest sum of $833 out of its annual expenditures of about $18,000, see 643 F. Supp., at 1313, 1336) during its contract negotiations. As the District Court found, these expenses were "incurred for the purpose of informing the public of the issues involved in an attempt to bring public pressure to bear on the employer." *Id.*, at 1313. Because this type of public relations campaign is really a specialized form of lobbying, the chargeability of its costs should be evaluated under much the same analysis as that set forth in the preceding section. I conclude that a public campaign "designed to enhance the reputation of the teaching profession," 881 F. 2d, at 1394, serves to influence officials who control the terms of public-sector labor contracts in the same way as does lobbying for greater educational funding. Under the preceding analysis, therefore, I find that these costs are chargeable.

In excluding these costs from service fees, the principal opinion argues that charging dissenters for the public relations campaign violated the First Amendment because it involved "speech of a political nature in a public forum." *Ante,* at 528. But, as with its analysis of the PPE program, the opinion never examines whether the content of this speech actually "involve[s] additional interference with the First Amendment interests of objecting employees," *Ellis,* 466 U. S., at 456, beyond that already imposed by the agency shop. Indeed, the opinion appears preoccupied with form to the exclusion of content, giving great weight to the fact that the public relations campaign included "'informational picketing, media exposure, signs, posters and buttons.'" *Ante,* at 529, quoting 643 F. Supp., at 1313.

Under a proper First Amendment analysis based on content, however, it is clear that a public relations campaign

"in support of the teaching profession generally," *ante*, at 528, does not impose burdens upon dissenting employees that are significantly greater than those already created by the agency shop. After all, union negotiators must argue—either implicitly or explicitly—during a collective-bargaining session that the teachers they represent (including petitioners) are valuable public servants who deserve higher compensation or benefits. The agency shop requires dissenting employees to support this latter message. I see no difference, for First Amendment purposes, in requiring dissenting employees to support a public version of that message aimed at other parts of the public-sector "employer," such as legislators and voters. Nor is the compelled funding of a message that praises one's own profession likely to occasion the strong personal reaction that the enforced support for more topical statements might provoke. As the principal opinion itself observes, "the extent of one's disagreement with the subject of compulsory speech is relevant to the degree of impingement upon free expression that compulsion will effect." *Ante*, at 522.

### III

Finally, I disagree in one significant respect with the analysis in the principal opinion of union activities occurring outside petitioners' bargaining unit. The opinion correctly holds that most expenses for these extra-unit activities may be included within the service fees because dissenting employees must bear "their share of general collective-bargaining costs of the state or national parent union." *Ante*, at 527. But the opinion finds that dissenting employees may not be charged for "litigation that does not concern the dissenting employees' bargaining unit or, by extension, . . . union literature reporting on such activities." *Ante*, at 528. The opinion's discussion of extra-unit litigation costs is no more than dicta since, as far as appears from the record before us, no such costs are at issue in this case. The District Court did not advert to litigation costs when it enumerated

the elements of the approved service fee, see 643 F. Supp., at 1326–1329,* the Court of Appeals omitted any mention of such costs in its review of the trial judge's ruling, and neither party discusses such costs in its submissions to this Court.

The costs for *reporting* on extra-unit litigation are at issue in this case, and I disagree with the Court's unreasonable conclusion that these are not chargeable. The disputed expenses arise from the publication of, at most, 10 articles during the 1981–1982 year in MEA's statewide journal, the Teacher's Voice, see App. 229–230, that described lawsuits in which MEA was involved. The Court of Appeals did not specifically address the chargeability of any litigation reports, and it declined to determine whether "the district court may have erred in permitting plaintiffs to be charged for a few particular articles," on the ground that these were "allegations of essentially *de minimis* error." 881 F. 2d, at 1393, n. 1.

This characterization of MEA's publication costs is especially apt when applied to the reports on extra-unit litigation. Of the $29.50 that the District Court approved as the total dissenter charge for each petitioner in 1981–1982, see 643 F. Supp., at 1334, roughly $3.00 reflected the expenses of the Teacher's Voice, see *id.*, at 1328–1329. Since slightly more than 1% of that publication's column inches during 1981–1982 were devoted to litigation news, see *id.*, at 1336, we may reasonably assume that roughly four cents of each petitioner's service fee was used to report on extra-unit litigation. Surely, this amount is *de minimis*. The District Court was thus correct in concluding that, "from a cost-benefit standpoint, a decree requiring a unit-by-unit breakdown of charge-

---

*At one point in its discussion of "applicable law," the District Court did assert that "a unit-by-unit breakdown of litigation . . . expenses" was not constitutionally required. 643 F. Supp., at 1325. This statement, however, appears either to have referred to the allocation of costs for *reporting* on extra-unit litigation, see *infra* this page and 546, or to have been a dictum.

able litigation expenses" would "create an unreasonable and unmanageable administrative burden on the . . . union defendants." *Id.*, at 1325. Nevertheless, JUSTICE BLACK-MUN's opinion finds that the union must isolate the costs of articles describing extra-unit litigation and exclude them from dissenter charges. Undoubtedly, the added cost to each bargaining unit member (including dissenters) of such an elaborate accounting will exceed the few pennies by which dissenter charges may be reduced. I find, as did the District Court, that this result "is not warranted by the Constitution or by logic under the facts of [this] case." *Id.*, at 1325–1326.

In determining which activities may be covered by dissenter charges, we have long recognized that " '[t]he furtherance of [employees'] common cause leaves some leeway for the leadership of the group," *Abood*, 431 U. S., at 222–223, quoting *Street*, 367 U. S., at 778 (Douglas, J., concurring), and that "[a]bsolute precision in the calculation of [the] proportion [of union dues chargeable to dissenters] is not, of course, to be expected or required; we are mindful of the difficult accounting problems that may arise," *Railway Clerks* v. *Allen*, 373 U. S. 113, 122 (1963). The four-cent charge that each petitioner challenges here falls well within the margin of grace that we have previously approved.

The principal opinion ignores the fact that the costs involved in the litigation reports are minimal and forges ahead to conduct a constitutional analysis. It does so, presumably, because it believes that petitioners would be willing to absorb the greater charges likely to result from a scrupulous accounting of article costs in order to avoid payment of even a few pennies for articles with which they disagree. The opinion reasons that, because litigation is "more akin to lobbying" due to its "political and expressive nature," costs of extra-unit litigation, *i. e.*, litigation initiated on behalf of other bargaining units, are not chargeable. *Ante*, at 528. If the opinion means to state a *per se* rule, then this statement is surely

incorrect and indeed is belied by the record in this case. The litigation about which the Teacher's Voice reported included two lawsuits involving retirement benefits, one damages claim by an individual teacher, one suit contesting "teacher control of the education process of the classroom," and two suits to avert shutdowns of schools in need of additional funding. See App. 229–230 (internal quotation marks omitted). It is doubtful that this litigation has a "political and expressive nature" as that concept has evolved in the relevant cases. See, *e. g., NAACP* v. *Button,* 371 U. S. 415 (1963). Rather, this litigation appears to be germane to the collective-bargaining and particularly the grievance duties of the union, and it seems that the District Court so held, see 643 F. Supp., at 1328 (assessing "chargeable content" of articles in Teacher's Voice); *id.,* at 1325 (finding that litigation should be treated the same as any other cost under germaneness test).

Perhaps the principal opinion means to say only that respondents failed to carry the burden of proving that articles in the Teacher's Voice covered lawsuits that were germane to representational duties. The opinion hints that its holding is something less extreme than a *per se* rule when it explains in these words why respondents' litigation reports are nonchargeable: "*When* unrelated to an objecting employee's unit, such activities are not germane to the union's duties as exclusive bargaining representative." *Ante,* at 528 (emphasis added). As I read this statement, the opinion would permit a union representative to show that a lawsuit filed by its statewide union parent is related to an objecting employee's unit even though the suit does not arise out of facts occurring in that unit. Moreover, where the disputed cost is only that of articles written about such litigation, the union might well show that this *reporting* was germane to its duties to represent an "objecting employee's unit," *ibid.,* even if the under-

lying lawsuits were not. The information in such articles may be useful to extra-unit employees since they may confront legal issues similar to those faced in sibling units and may therefore contemplate bringing similar suits.

As noted, the principal opinion determines that none of respondents' costs for reporting on litigation is chargeable. If that judgment rests not on a *per se* rule excluding reports on extra-unit litigation but rather on a conclusion that respondents failed to prove that the extra-unit litigation reported on in this case was related to petitioners' unit, then the opinion has engaged in *de novo* factfinding without explaining its basis for overruling the District Court's findings. The Court of Appeals did not evaluate the chargeability of any litigation articles in the Teacher's Voice—presumably because of its finding that the costs involved in any particular article were *de minimis*. Since the opinion implicitly rejects the Court of Appeals' reliance on the *de minimis* rationale, and since this is the first time the District Court's findings on this issue have been subjected to appellate review, the proper course is to remand to the Court of Appeals for a determination of whether the District Court erred in finding that all of the litigation articles were chargeable. See *Anderson* v. *Liberty Lobby, Inc.*, 477 U. S. 242, 257 (1986); see also *United States* v. *Hasting*, 461 U. S. 499, 515–518 (1983) (STEVENS, J., concurring in judgment) (Court should not undertake record-review "function that can better be performed by other judges").

The principal opinion also appears to rely on *Ellis* v. *Railway Clerks*, 466 U. S. 435 (1984), for its conclusion that dissenters may not be compelled to bear the costs of articles on extra-unit litigation. *Ellis* arose in very different circumstances and, in my view, is not controlling here. In *Ellis*, the Court held that the union shop provisions of the RLA did not authorize inclusion of extra-unit litigation costs within dissenter charges and that, "[g]iven [this] holding," dissenters also "cannot be charged for the expense of reporting

those activities." 466 U. S., at 451, n. 11. The decision in *Ellis*, however, was based on "the scope of the statutory authorization," *id.*, at 444, taking into account "that Congress' essential justification for authorizing the union shop was the desire to eliminate free riders," *id.*, at 447. Thus, exclusion of these costs appears to have been based solely on the RLA. As the principal opinion correctly notes, the statutory construction in *Ellis* was "informed by the First Amendment." *Ante*, at 528. But nothing in the Court's discussion of extra-unit litigation, much less of the reporting on such litigation, suggests a constitutional rather than statutory basis for excluding these particular costs from dissenter charges. Accordingly, *Ellis* does not resolve the question now before us: whether a state government's agency shop agreement—construed under state law as authorizing charges to dissenting employees for the costs of articles on extra-unit litigation—violates the First Amendment. I am inclined to think that it does not, so long as the suits described in the articles would be a chargeable expense within the bargaining unit on whose behalf the suit was brought, but I would leave that to be resolved in the first instance by the Court of Appeals were we to remand this case.

Even if *Ellis*' exclusion of reporting expenses was based on the First Amendment rather than the RLA, that ruling would not control the present case. The *Ellis* Court did not have before it evidence—much less a lower court finding—that the disputed reporting charges were *de minimis*. I very much doubt that the *Ellis* Court would have imposed the burdensome accounting procedure that it did—and that the principal opinion requires here—had the amount in dispute been a mere four cents. See *Ellis*, 466 U. S., at 449–450 (upholding chargeability of union's expenses for social activities, which amounted to only 0.7% of expenditures and were "*de minimis*"); *id.*, at 456 (permitting "the union . . . a certain flexibility in its use of compelled funds").

## IV

The charges at issue in this case are, under any reasonable conception, "germane" to the duties of respondent unions and therefore advance the important governmental interests in deterring free riders and promoting labor peace. On the other hand, the First Amendment interests of dissenting members of the bargaining unit, like those of dissenting taxpayers, are insufficiently strong to outweigh the governmental interests. For these reasons, I respectfully dissent from the Court's conclusion that the three types of charges discussed above may not be included in the service fees.

JUSTICE SCALIA, with whom JUSTICE O'CONNOR and JUSTICE SOUTER join, and with whom JUSTICE KENNEDY joins as to all but Part III–C, concurring in the judgment in part and dissenting in part.

While I agree with the Court's disposition of many of the challenged expenditures, I do not agree with the test it proposes. In my view today's opinion both expands and obscures the category of expenses for which a union may constitutionally compel contributions from dissenting nonmembers in an agency shop. I would hold that contributions can be compelled only for the costs of performing the union's statutory duties as exclusive bargaining agent.

## I

The Court purports to derive from "*Hanson* and *Street* and their progeny," *ante*, at 519, a proverbial three-part test, whereunder activities are chargeable to nonunion members of the bargaining unit if (1) they are "'germane' to collective-bargaining activity," (2) they are "justified by the government's vital policy interest in labor peace and avoiding 'free riders,'" and (3) they do not "significantly add to the burdening of free speech that is inherent in the allowance of an

agency or union shop." *Ibid.*[1] As I shall later discuss, I do not find this test set forth in the referenced opinions. Since, moreover, each one of the three "prongs" of the test involves a substantial judgment call (What is "germane"? What is "justified"? What is a "significant" additional burden?) it seems calculated to perpetuate give-it-a-try litigation of monetary claims that are individually insignificant but cumulatively worth suing about, in the style of the present case.

To take but one example, presented by the facts before us: The majority would permit charging nonmembers for an informational newsletter that "concern[s] teaching and education generally, professional development, unemployment, job opportunities, award programs of the MEA, and other miscellaneous matters," *ante*, at 529; but four Members of that majority would not permit charging for "'informational picketing, media exposure, signs, posters and buttons,'" *ibid.* As I shall discuss in greater detail later, it seems to me that the former, the allowed charge, fails the "germaneness-to-collective-bargaining" test, and that the latter, the disallowed charge, fares no worse than the former insofar as the asserted basis for its disallowance, the "significant-additional-burden" test, is concerned. Thus, the three-part test, if its application is to be believed, provides little if any guidance to parties contemplating litigation or to lower courts. It does not eliminate past confusion, but merely establishes new terminology to which, in the future, the confusion can be assigned.

I think this unhelpful test is neither required nor even suggested by our earlier cases, and that a much more administrable criterion is.

---

[1] The Court proceeds on the assumption, as have our earlier cases, that all forced contributions to a union implicate the First Amendment, whether or not the activities to which the contributions are directed are communicative. That assumption has not been challenged in the present appeal.

## II

In past decisions considering both constitutional and statutory challenges to state compulsion of union dues, we have focused narrowly upon the union's role as an exclusive bargaining agent. In *Railway Employes* v. *Hanson*, 351 U. S. 225 (1956), we upheld the federal union shop provision, § 2 Eleventh of the Railway Labor Act (RLA), 45 U. S. C. § 152 Eleventh, against a First Amendment challenge. We emphasized that the statute sought only to ensure that workers would reimburse unions for the unions' bargaining efforts on their behalf. "We . . . hold that the requirement for financial support of the collective-bargaining agency by all who receive the benefits of its work is within the power of Congress . . . and does not violate . . . the First . . . Amendmen[t]." *Hanson, supra*, at 238. We expressly reserved the question whether the Act could, consistent with the Constitution, allow a union to charge expenses other than those related to bargaining. As Justice Black later described the case: "Thus the *Hanson* case held only that workers could be required to pay *their part of the cost of actual bargaining* carried on by a union selected as a bargaining agent under authority of Congress, just as Congress doubtless could have required workers to pay the cost of such bargaining had it chosen to have the bargaining carried on by the Secretary of Labor or any other appropriately selected bargaining agent." *Machinists* v. *Street*, 367 U. S. 740, 787 (1961) (Black, J., dissenting) (emphasis added).

In *Abood* v. *Detroit Board of Education*, 431 U. S. 209 (1977), we reaffirmed that the union's role as bargaining agent gave rise to the state interest in compelling dues:

> "The designation of a union as exclusive representative carries with it great responsibilities. The tasks of negotiating and administering a collective-bargaining agreement and representing the interests of employees in settling disputes and processing grievances are continuing and difficult ones. They often entail expendi-

ture of much time and money. The services of lawyers, expert negotiators, economists, and a research staff, as well as general administrative personnel, may be required. Moreover, in carrying out these duties, the union is obliged fairly and equitably to represent all employees . . . , union and nonunion, within the relevant unit. A union-shop arrangement has been thought to distribute fairly the cost of *these activities* among those who benefit, and it counteracts the incentive that employees might otherwise have to become free riders—to refuse to contribute to the union while obtaining benefits of union representation that *necessarily* accrue to all employees." *Id.*, at 221–222 (internal quotation marks, citations, and footnote omitted; emphasis added).

As this passage demonstrates, the state interest that can justify mandatory dues arises solely from the union's statutory duties. Mandatory dues allow the cost of "these activities"—*i. e.*, the union's statutory duties—to be fairly distributed; they compensate the union for benefits which "necessarily"—that is, by law—accrue to the nonmembers.

Our statutory cases, construing the mandatory dues provisions of §2 Eleventh of the RLA and §8(a)(3) of the Taft-Hartley Act, 29 U. S. C. §158(a)(3), are to the same effect. In *Street*, we said of §2 Eleventh:

"[I]n prescribing collective bargaining as the method of settling railway disputes, in conferring upon the unions the status of exclusive representatives in the negotiation and administration of collective agreements, and in giving them representation on the statutory board to adjudicate grievances, Congress has given the unions a clearly defined and delineated role to play in effectuating the basic congressional policy of stabilizing labor relations in the industry. . . .

"Performance of these functions entails the expenditure of considerable funds. Moreover, this Court has

held that under the statutory scheme, a union's status as exclusive bargaining representative carries with it the duty fairly and equitably to represent all employees of the craft or class, union and nonunion. . . . [The unions] maintained that *because of the expense of performing their duties in the congressional scheme,* fairness justified the spreading of the costs to all employees who benefited.

"This argument was decisive with Congress. . . . [Section] 2, Eleventh contemplated compulsory unionism to force employees to share the costs of negotiating and administering collective agreements, and the costs of the adjustment and settlement of disputes." 367 U. S., at 760–764.

We consequently held in *Street* that expenses relating to political and ideological activities could not be charged to nonmembers, for these were "a use which falls clearly outside the reasons advanced by the unions and accepted by Congress why authority to make union-shop agreements was justified." *Id.,* at 768.

Our analysis in *Ellis* v. *Railway Clerks,* 466 U. S. 435 (1984), began by reaffirming that "[w]e remain convinced that Congress' essential justification for authorizing the union shop [in § 2 Eleventh] was the desire to eliminate free riders—employees in the bargaining unit *on whose behalf the union was obliged to perform its statutory functions,* but who refused to contribute to the cost *thereof.*" *Id.,* at 447 (emphasis added). "[W]hen employees . . . object to being burdened with particular union expenditures, the test must be whether the challenged expenditures are necessarily or reasonably incurred *for the purpose of performing the duties of an exclusive representative of the employees in dealing with the employer* on labor-management issues." *Id.,* at 448 (emphasis added). Thus we concluded, for example, that the costs of union membership drives could not be charged, be-

cause, although it might be true "that employees will ultimately ride for free on the union's organizing efforts," "the free rider Congress had in mind was the employee the union was required to represent and from whom it could not withhold benefits obtained for its members." *Id.*, at 452. And expenses for litigation "seeking to protect the rights of airline employees generally" could not be charged, but only those for litigation "incident to negotiating and administering the contract or to settling grievances and disputes arising in the bargaining unit," and "other litigation . . . that concerns bargaining unit employees and is normally conducted by the exclusive representative." *Id.*, at 453.

Most recently, in *Communications Workers* v. *Beck*, 487 U. S. 735 (1988), we concluded that "§ 8(a)(3) [of the Taft-Hartley Act], like its statutory equivalent, § 2 Eleventh of the RLA, authorizes the exaction of only those fees and dues *necessary to 'performing the duties of an exclusive representative* of the employees in dealing with the employer on labor-management issues.'" *Id.*, at 762–763, quoting *Ellis, supra,* at 448 (emphasis added).

*Street, Ellis,* and *Beck* were statutory cases, but there is good reason to treat them as merely reflecting the constitutional rule suggested in *Hanson* and later confirmed in *Abood.* *Street* adopted a construction of the RLA nowhere suggested in its language, to avoid "serious doubt of [its] constitutionality." 367 U. S., at 749. As Justice Black argued in dissent: "Neither § 2, Eleventh nor any other part of the Act contains any implication or even a hint that Congress wanted to limit the purposes for which a contracting union's dues should or could be spent . . . [N]o one has suggested that the Court's statutory construction of § 2, Eleventh could possibly be supported without the crutch of its fear of unconstitutionality." *Id.*, at 784, 786 (dissenting opinion). See also *Beck, supra,* at 763 (BLACKMUN, J., concurring in part and dissenting in part) ("Our accepted mode of resolving statutory questions would not lead to a construction of § 8(a)(3) so

foreign to that section's express language and legislative history").

Our First Amendment jurisprudence therefore recognizes a correlation between the rights and the duties of the union, on the one hand, and the nonunion members of the bargaining unit, on the other. Where the state imposes upon the union a duty to deliver services, it may permit the union to demand reimbursement for them; or, looked at from the other end, where the state creates in the nonmembers a legal entitlement from the union, it may compel them to pay the cost. The "compelling state interest" that justifies this constitutional rule is not simply elimination of the inequity arising from the fact that some union activity redounds to the benefit of "free-riding" nonmembers; private speech often furthers the interests of nonspeakers, and that does not alone empower the state to compel the speech to be paid for. What is distinctive, however, about the "free riders" who are nonunion members of the union's own bargaining unit is that in some respects *they* are free riders whom the law *requires* the union to carry—indeed, requires the union to go *out of its way* to benefit, even at the expense of its other interests. In the context of bargaining, a union *must* seek to further the interests of its nonmembers; it cannot, for example, negotiate particularly high wage increases for its members in exchange for accepting no increases for others. Thus, the free ridership (if it were left to be that) would be not incidental but calculated, not imposed by circumstances but mandated by government decree.

Once it is understood that the source of the state's power, despite the First Amendment, to compel nonmembers to support the union financially, is elimination of the inequity that would otherwise arise from mandated free-ridership, the constitutional limits on that power naturally follow. It does not go beyond the expenses incurred in discharge of the union's "great responsibilities" in "negotiating and administering a collective-bargaining agreement and representing the inter-

ests of employees in settling disputes and processing griev-
ances," *Abood*, 431 U. S., at 221; the cost of performing the
union's "statutory functions," *Ellis*, 466 U. S., at 447; the ex-
penses "necessary to 'performing the duties of an exclusive
representative,'" *Beck*, *supra*, at 762. In making its other
disbursements the union can, like any other economic actor,
seek to eliminate inequity by either eliminating the benefit or
demanding payment in exchange for not doing so. In a pub-
lic relations campaign, for example, it can, if nonmembers
refuse to contribute, limit the focus of publicity to union
members, or even direct negative publicity against nonmem-
bers, or terminate the campaign entirely. There is no rea-
son—and certainly no compelling reason sufficient to survive
First Amendment scrutiny—for the state to interfere in the
private ordering of these arrangements, for the state itself
has not distorted them by compelling the union to perform.

The first part of the test that the Court announces—that
the activities for which reimbursement is sought must be
"germane" to collective-bargaining activity—could, if prop-
erly elaborated, stand for the proposition set forth above.
But it is not elaborated, and the manner in which the Court
applies it to the expenditures before us here demonstrates
that the Court considers an expenditure "germane" to collec-
tive bargaining not merely when it is reasonably necessary
for the very performance of that collective bargaining, but
whenever it is reasonably designed to achieve a more favor-
able outcome from collective bargaining (*e. g.*, expenditures
for strike preparations). That in my view is wrong. The
Court adds two further tests, which apparently all expendi-
tures that pass the first one must also meet, but neither of
them compensates for the overly broad concept of "germane-
ness." I think that those two additional tests, which are
seemingly derived from Part VI of the *Ellis* opinion, repre-
sent a mistaken reading of that case,[2] but since they make no

---

[2] Part VI of *Ellis* v. *Railway Clerks*, 466 U. S. 435 (1984), addresses
the constitutionality, under the First Amendment, of the compulsory pay-

difference to my analysis of the expenditures at issue here I need not contest them.

I would hold that to be constitutional a charge must *at least* be incurred in performance of the union's statutory duties. I would make explicit what has been implicit in our cases since *Street:* A union cannot constitutionally charge nonmembers for any expenses except those incurred for the conduct of activities in which the union owes a duty of fair representation to the nonmembers being charged.

## III

### A

Applying this test, I readily conclude that a number of the challenged expenses cannot be charged to the nonmembers. Michigan defines the union's duty as that of "be[ing] the exclusive representativ[e] of all the public employees in [its] unit for the purposes of collective bargaining," Mich. Comp. Laws § 423.211 (1978), and defines collective bargaining as

---

ments (for three separate categories of activities) the opinion had earlier found the RLA permitted. As I read it, it contains two discussions: First, an explanation of why the First Amendment is not violated by compelled contribution for those two categories of activity that passed the RLA "statutory duty" requirement. Since, as I have discussed in text, that "statutory duty" requirement is *itself* the constitutional test and justification, this explanation is little more than a tautology (which is why it could be so brief, all of Part VI occupying little more than 2 pages of a 19-page opinion): The compelled contributions did not violate the First Amendment because they involve "little additional infringement of First Amendment rights beyond that already accepted" in approving the constitutionality of the "union shop," *id.*, at 456, *i. e.*, enforced dues *for the union's collective-bargaining activities*, see *id.*, at 447. The second discussion in Part VI did set forth an additional requirement for constitutionality, but it pertained only to the one compulsory payment that was not in furtherance of the "statutory duty," but had survived the statutory analysis only because its amount was *de minimis*, see *id.*, at 450. That additional requirement was that its First Amendment impact must be *de minimis* as well—*i. e.*, the expenditure must not be for communicative activity, so that it "does not increase the infringement of . . . First Amendment rights already resulting from the compelled contribution to the union," *id.*, at 456.

"the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder," § 423.214.[3]   Public relations activities, though they may certainly affect the outcome of negotiations, are no part of this collective-bargaining process.   For the same reason I agree that the challenged lobbying expenses are nonchargeable.   I emphatically do not agree that costs of the parts of the union's magazine "that concern teaching and education generally, professional development, unemployment, job opportunities, award programs . . . and other miscellaneous matters," *ante*, at 529, can be charged to nonmembers. As the Court appears to concede, the magazine items challenged here have nothing whatever to do with bargaining, and I cannot understand how they can be upheld even under the Court's own test.   The Court suggests that they fall within the *de minimis* exception of *Ellis*, see 466 U. S., at 456.   But the charges allowed on that basis in *Ellis* (the cost of refreshments at union business meetings and occasional social functions) were *de minimis* not only in amount but also in First Amendment impact.   They were constitutional because:

> "the communicative content is not inherent in the act, but stems from the union's involvement in it.   The objection is that these are *union* social hours.   Therefore, the fact that the employee is forced to contribute does

---

[3] The Court suggests, *ante* at 526, that this "broad language" fails to provide guidance as to the scope of the union's statutory duties.   It seems to me, however, that it makes entirely clear that the union's duties extend *only* to negotiating an agreement and resolving disputes under it.   This demonstrates, coincidentally, the error of the Court's assertion that it will be burdensome for courts to construe the scope of union duties under applicable laws.   That assertion is implausible in any event, since courts routinely perform such construction when deciding suits alleging a breach of the union's statutory duty.

not increase the infringement of his First Amendment rights already resulting from the compelled contribution to the union." *Id.*, at 456.

Here, in contrast, the newsletter is inherently communicative; that the Court thinks what it communicates is "for the benefit of all," *ante*, at 529, does not lessen the First Amendment injury to those who do not agree.

## B

The Court permits the charging of all expenses of sending delegates to conventions held by the Michigan Education Association (MEA), the National Education Association (NEA), and the 13E Coordinating Council. Quoting *Ellis, supra,* at 449–450, the Court says that "'[c]onventions such as those at issue here are normal events . . . and seem to us to be essential to the union's discharge of its duties as bargaining agent.'" *Ante,* at 530. The conventions at issue in *Ellis,* however, were those of the union-bargaining agent *itself;* and the costs were chargeable because "if a union is to perform its statutory functions, it must maintain its corporate or associational existence, must elect officers to manage and carry on its affairs, and may consult its members about overall bargaining goals and policy." 466 U. S., at 448. But that reason obviously does not apply to costs for attendance at the convention of *another* organization with which the union-bargaining agent chooses to affiliate. It is not "essential to [the Ferris Faculty Association's] discharge of its duties as bargaining agent," *id.*, at 448–449, that the MEA, NEA, and 13E Coordinating Council "maintain [their] corporate or associational existence, . . . elect officers," etc. It may be that attendance at certain meetings of those organizations, where matters specifically relevant to the union's bargaining responsibilities are discussed, are properly chargeable, but attendance at all conventions seems to me clearly not.

Another item relating to affiliated organizations that the Court allows to be charged consists of a pro rata assessment of NEA's costs in providing collective-bargaining services (such as negotiating advice, economic analysis, and informational assistance) to its affiliates nationwide, and in maintaining the support staff necessary for that purpose. It would obviously be appropriate to charge the cost of such services *actually provided* to Ferris *itself*, since they relate directly to performance of the union's collective-bargaining duty. It would also be appropriate to charge to nonunion members an annual fee charged by NEA in exchange for contractually promised availability of such services from NEA on demand. As Ferris conceded at argument, however, there is no such contractual commitment here. The Court nonetheless permits the charges to be made, because "[t]he essence of the affiliation relationship is the notion that the parent will bring to bear its often considerable economic, political, and informational resources when the local is in need of them." *Ante*, at 523. I think that resolution is correct. I see no reason to insist that, in order to be chargeable, on-call services for use in the bargaining process be committed by contract rather than by practice and usage. If and when it becomes predictable that requested assistance from the NEA will not be forthcoming, the nonunion members would presumably have cause to object to the charges, just as they would have cause to object if written contracts for the services would predictably not be honored.[4]

---

[4] The Court suggests, *ante*, at 532, n. 6, that the cost of NEA assistance would not be chargeable under the "statutory duties" test because the use of such assistance is not affirmatively *required* by the Michigan statute. This distorts what I mean by the "statutory duties" test. I suppose union representatives are not *required* to bring paper and pencils into negotiating sessions, so long as they can commit relevant matters to memory; but I would certainly permit the union to charge the cost of such materials, because they are reasonably necessary to effective performance of the statutory duty of bargaining. Such expenses are to be distinguished from those

I assuredly do not agree, however, with the other reason that the Court gives for its conclusion on this point—or perhaps it can more accurately be characterized as the general principle that the Court derives from its conclusion: namely, that chargeability does not require "a direct relationship between the expense at issue and some tangible benefit to the dissenters' bargaining unit." *Ante*, at 522. It assuredly does, and a tangible benefit relating to the union's performance of its representational duties. It is a tangible benefit, however, to have expert consulting services on call, even in the years when they are not used.

## C

The final category of challenged expenses consists of the costs of preparing for a strike. In conducting a strike, a union does not act in its capacity as the government-appointed bargaining agent for all employees. And just as, for that reason, nonmembers cannot be assessed the costs of the strike, neither can they be assessed the costs of preparing for the strike. It may be true, of course, that visible preparations for a strike strengthen the union's position in negotiations. But so does the strike itself, and many other union activities, including lobbying. The test of chargeability, as I have described it, is not whether the activities at issue help or hinder achievement of the union's bargaining objectives, but whether they are undertaken as part of the union's representational duty.

For the foregoing reasons, I concur in part and dissent in part.

JUSTICE KENNEDY, concurring in the judgment in part and dissenting in part.

I join all except for Part III–C of JUSTICE SCALIA's opinion. With respect to the strike preparation activities, I

that may improve the outcome of the negotiations, but do so through some means other than the bargaining process.

agree with the majority that these are indistinguishable in substance from other expenses of negotiating a collective-bargaining agreement. I would find, under JUSTICE SCALIA's test, that it was reasonable to incur these expenditures to perform the duties of an exclusive representative of the employees in negotiating an agreement.

The opinion for the majority discerns an altogether malleable three-part test for the chargeability of expenses. The test is so malleable that, at Part IV–B, JUSTICE BLACKMUN can choose to draw different lines with respect to expenses of affiliates, lines with no principled basis. JUSTICE BLACKMUN removes litigation and lobbying from the scope of the Court's holding that a local bargaining unit may charge employees for their pro rata share of the costs associated with "otherwise chargeable" expenses of affiliate unions. This makes little sense if we acknowledge, as JUSTICE SCALIA articulates, *ante*, at 560–561, that we permit charges for affiliate expenditures because such expenditures do provide a tangible benefit to the local bargaining unit, in the nature of a prepaid but noncontractual consulting or legal services plan. Will a local bargaining unit now be permitted to charge dissenters for collective-bargaining-related litigation so long as the unit enters into a contractual arrangement or insurance policy with its affiliate? If so, JUSTICE BLACKMUN's distinction has little meaning. If not, then why not, for I discern no additional burden on free speech from such an arrangement, so long as the litigation is undertaken in the course of the union's duties as exclusive bargaining representative. I would draw the same substantive line for litigation and lobbying, whether it is funded through an arrangement with an affiliate or by an individual unit.

In both the discussion of extraunit litigation, at Part IV–B, and of conventions, at Part IV–E, JUSTICE BLACKMUN places unfounded reliance upon *Ellis* v. *Railway Clerks*, 466 U. S. 435 (1984), where we disallowed some expenses for extraunit litigation, and allowed other expenses for a union convention.

*Ellis*, however, contains no discussion of whether a local bargaining unit might choose to fund litigation which is "a normal incident of the duties of the exclusive representative," *id.*, at 453, through a cost sharing arrangement under the auspices of the affiliate. Also, as JUSTICE SCALIA indicates, the conventions in the case before us were political events in large part, and cannot support an analogy to the quadrennial convention at issue in *Ellis*. We should avoid establishing rigid categories such as conventions (chargeable) and extra-unit litigation (nonchargeable), but rather examine whether each expense was reasonably or necessarily incurred in the performance of the union's statutory duties as exclusive bargaining representative.