In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-4080

JON E. KINGSTAD, STEVE LEVINE AND
JAMES S. THIEL,

*Plaintiffs-Appellants*,

*v.*

STATE BAR OF WISCONSIN,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 3:09-cv-00216-SLC—**Stephen L. Crocker**, *Magistrate Judge*.

ARGUED APRIL 15, 2010—DECIDED SEPTEMBER 9, 2010

Before BAUER, ROVNER, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge.* To practice law in the State
of Wisconsin, lawyers must join the Wisconsin State
Bar. To join the State Bar, lawyers must pay State Bar
dues. For more than fifty years, this system has been
generating First Amendment litigation, and this case is
the latest installment. In 2007, the State Bar used a por-
tion of members' dues to conduct a public image cam-

paign with the goal of improving the public's perception of Wisconsin lawyers. Petitioners Jon Kingstad, Steven Levine, and James Thiel (collectively, the "Objectors") objected to the State Bar's use of their mandatory dues to fund the campaign as a violation of their rights under the First Amendment. Their objection was first heard by a state arbitrator, who ruled in favor of the State Bar. The Objectors appealed to a state trial court, and the State Bar removed their appeal to the federal courts. The parties consented to having their case heard by Magistrate Judge Stephen Crocker, who upheld the arbitrator's determination. The petitioners now appeal to this court.

We hold that to withstand scrutiny under the First Amendment, State Bar expenditures funded by mandatory dues must be germane to the legitimate purposes of the State Bar. In doing so, we overrule one of the alternative holdings of *Thiel v. State Bar of Wisconsin*, 94 F.3d 399, 405 (7th Cir. 1996), in light of more recent teachings. Because the public image campaign at issue in this case is germane to those constitutionally legitimate purposes, however, we affirm the judgment in favor of the State Bar.

*Factual and Procedural Background*

I.  *Purposes, Activities and Funding of the State Bar of Wisconsin*

The State Bar of Wisconsin is a creation of the Wisconsin Supreme Court, which also governs bar activities

under its rules. See Wis. S. Ct. R. 10.01. Membership in the State Bar is a "condition precedent to the right to practice law in Wisconsin." Rule 10.01(1). The stated purposes of the State Bar are to:

> aid the courts in carrying on and improving the administration of justice; to foster and maintain on the part of those engaged in the practice of law high ideals of integrity, learning, competence and public service and high standards of conduct; to safeguard the proper professional interests of the members of the bar; to encourage the formation and activities of local bar associations; to conduct a program of continuing legal education; to assist or support legal education programs at the preadmission level; to provide a forum for the discussion of subjects pertaining to the practice of law, the science of jurisprudence and law reform and the relations of the bar to the public and to publish information relating thereto; to carry on a continuing program of legal research in the technical fields of substantive law, practice and procedure and make reports and recommendations thereon within legally permissible limits; to promote the innovation, development and improvement of means to deliver legal services to the people of Wisconsin; to the end that the public responsibility of the legal profession may be more effectively discharged.

Rule 10.02(2). To serve these broad purposes, the Wisconsin Supreme Court rules permit the State Bar to engage in and fund "any activity that is reasonably in-

tended" to further the State Bar's purposes. Rule 10.03(5)(b)1. However, the Rules make clear that the State Bar may not use the compulsory dues of any objecting member "for political or ideological activities that are not reasonably intended for the purpose of regulating the legal profession or improving the quality of legal services." *Id*. Those activities must be funded by voluntary dues or other sources of revenue.

A bar member may choose to withhold his or her pro rata portion of dues that were budgeted for activities that cannot be supported by compulsory dues. See Rule 10.03(5)(b)2. To enable members to assert their rights, the State Bar must publish each year a written notice of the activities that can and cannot be supported by compulsory dues, including each member's pro rata portion of each. If a member contends that the State Bar has allocated dues incorrectly between compulsory and voluntary activities, the member may demand that the question be settled by an arbitrator. See Rule 10.03(5)(b)3. In this case, the Objectors objected to the State Bar's expenditure of mandatory dues on a public image campaign for lawyers in fiscal year 2007.

II.  *The State Bar's Public Image Campaign*

The State Bar launched the public image campaign in response to signs that some bar members saw a need for such a program. In the State Bar's 1998 Membership Survey, when asked what they needed from the State Bar, 15 of 145 members responding indicated that they would like the State Bar to improve the image of the

legal profession in the community.[1] One member wrote that the State Bar needed "better involvement in addressing the public's perception of lawyers." Another commented that "the Bar needs to do more to improve the image of lawyers and the legal profession in general." A third noted that members needed "an aggressive public relations program." In 2000, a poll of all State Bar division, section, and committee chairs and local bar presidents showed that 78% believed a State Bar-led message development campaign was necessary. And in 2001, 89% of respondents to the State Bar's Bench Bar survey indicated that they believed the reputation of the legal profession had declined in the eyes of the public.

In the midst of these studies, the Office of the Chief Justice of the Wisconsin Supreme Court, the Director of State Courts, the League of Women Voters of Wisconsin, and the State Bar established the Public Trust Steering Committee to address issues of public trust and confidence in the Wisconsin justice system. The project had three phases: first, to research and identify issues concerning public trust and confidence; second, to gather input from public focus groups; and third, to create an action plan. The action plan was finalized in October 2000. The Committee reported, among other points, that judges and attorneys needed to be encouraged to be involved in the community. The Committee found that increasing public confidence in the justice system

---

[1] Only one other need—lowering costs and fees of State Bar seminars, conventions, dues, and section memberships—received more comments.

depended on people knowing and trusting the decision-makers and understanding the legal process, and that judges and attorneys who were active in the community were perceived to be more trustworthy. The Committee recommended increased judicial and attorney participation in and connection to their communities.

The State Bar formed a Public Image Committee to address some of these concerns. Its purpose was to "educate the public about the legal profession and develop a common theme about how lawyers contribute to the community." President's Message, 74 Wis. Law. 11 (Nov. 2001). The effort focused on the expertise, problem-solving skills, and service to the community of Wisconsin lawyers.

In 2002 the Public Image Committee unveiled a public image campaign that carried the slogan "Wisconsin Lawyers. Expert Advisers. Serving You." Examples of the materials developed and aired include:

- television spots featuring lawyers from the Green Bay and Fox Valley area involved in a number of community projects to improve the lives of senior citizens and the Hmong population, elementary and high school students involved in mock trial efforts, and other community groups and activities;

- television spots featuring Dane County area lawyers volunteering their time to the Dane County Bar Association's Family Law Assistance Center; and

- television spots featuring La Crosse and Eau Claire area lawyers using their legal skills to assist the

La Crosse County Bar's Free Legal Clinic, a free legal clinic for homeless veterans in Tomah, and the La Crosse area bar's support for "Jim's Grocery Bag," eleven La Crosse School District food pantries.

In fiscal year 2007—the year on which the fiscal year 2009 reduction was based and the focus of this lawsuit—the State Bar spent $97,886 of mandatory dues on the public image campaign. That amounted to $5.16 per member.

III. *Proceedings Before the Arbitrator and the District Court*

Pursuant to Wisconsin Supreme Court Rule 10.03(5)(b), the Objectors' claim was first heard by an arbitrator. The Objectors argued that the State Bar's expenditure of mandatory dues on the public image campaign violated their rights under the First Amendment because the expenditures were not related to either the regulation of lawyers or improving the quality of legal services, and were ideological in nature. Cautioning that under the State Bar bylaws he had "no authority to add, subtract, set aside or delete from any Supreme Court Rule or State Bar bylaw," the arbitrator ruled in favor of the State Bar. Arb. Dec. at 6, citing Wis. State Bar Bylaws, Art. I, Sec. 5(e)(vi). Although the arbitrator expressed "doubts about the 'germaneness' of the public image campaign," he concluded that having a good reputation was a proper professional interest for any profession and that the public image campaign appeared to fit into the State Bar's statutory purposes to "provide a forum for the discussion of subjects pertaining to the practice of law, . . . and the relations of the Bar to the

public and to publish information relating thereto." See Rule 10.02(2).

The arbitrator, however, ultimately was convinced that "germaneness" was irrelevant unless the challenged expenditure was political or ideological. See Arb. Dec. at 6-7, citing Rule 10.03(5)(b)1. The Objectors did not argue that the public relations campaign was political, and the arbitrator considered but rejected the Objectors' argument that the public image campaign was ideological. The arbitrator thus found that the State Bar had demonstrated that the public image campaign was within the language and intent of the applicable Wisconsin Supreme Court Rules and that the Objectors could be required to pay their share of its costs.

The Objectors sought judicial review of the arbitrator's decision in the state courts. The State Bar removed the action to federal court. Removal was proper under 28 U.S.C. §§ 1331 and 1441(b) because the Objectors' claim arose under the federal Constitution.[2] The parties

---

[2] The district court also suggested that after removal, the Federal Arbitration Act would control review of the arbitrator's decision. The point is largely moot because the standards under either the Wisconsin or federal arbitration statutes are identical. See Wis. Stat. § 788.10(1)(d); 9 U.S.C. § 10(a)(4). However, the FAA was not invoked by the parties, and our jurisdiction is based on the federal question raised by the Objectors, not the FAA, which is not an independent source of jurisdiction. *E.g.*, *Minor v. Prudential Securities, Inc.*, 94 F.3d 1103, 1104-05 (7th Cir. 1996). Because the state arbitrator

(continued...)

consented to have their case heard by Magistrate Judge Crocker under 28 U.S.C. § 636(c). Judge Crocker affirmed the arbitrator's decision. He rejected the Objectors' argument that language in this court's decision in *Thiel v. State Bar of Wisconsin*, 94 F.3d 399 (7th Cir. 1996), was overruled by the Supreme Court in *United States v. United Foods, Inc.*, 533 U.S. 405 (2001). See *Kingstad v. State Bar of Wisconsin*, 670 F. Supp. 2d 922, 926 (W.D. Wis. 2009). The Objectors then appealed to this court.

*Analysis*

I.    *Mandatory Associations under the First Amendment*

The Objectors argue that even though the State Bar's public image campaign was not political or ideological, it was not germane to the purposes of the State Bar that allow the group to compel members to support its group speech activities. Objectors contend that such forced expenditures must also be germane to the purposes of the State Bar in order to pass First Amendment scrutiny. Our review of this constitutional question is de novo. *Zbaraz v. Madigan*, 572 F.3d 370, 378 (7th Cir. 2009); *Klementanovsky v. Gonzales*, 501 F.3d 788, 791 (7th Cir. 2007). On this threshold issue of law, we agree with the Objectors.

---

[2]  (...continued)
arguably exceeded his powers, his decision was appealable, and because the underlying claim arose under the federal Constitution, the appeal was removable.

To understand why Objectors can be compelled to subsidize some but not all of the State Bar's activities, one must understand why integrated or mandatory bars are permissible under the First Amendment. We begin with a brief overview. The First Amendment issue arises because bar members are required by force of law to join the group (as a condition of practicing their profession) and to provide financial support for group speech. These requirements implicate the First Amendment freedom of association, which includes the freedom to choose not to associate, and the First Amendment freedom of speech, which also includes the freedom to remain silent or to avoid subsidizing group speech with which a person disagrees. See generally *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 471-72 (1997); *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 573-74 (1995); *Railway Employees' Department v. Hanson*, 351 U.S. 225, 236-38 (1956).

Despite this general rule against "forced speech," however, the Supreme Court has found that certain mandatory associations—agency shops, agricultural marketing collectives, and integrated or mandatory bars—are permitted under the First Amendment because the forced speech serves legitimate governmental purposes for the benefit of all members. For example, "agency shop" arrangements, in which all employees must pay union dues whether they are union members or not, are permitted because the government has an interest in peaceful labor relations. In general, peaceful labor relations are promoted if all employees share in

the expenses related to the collective bargaining from which all employees benefit—both union members and non-members. See, *e.g.*, *Abood v. Detroit Board of Education*, 431 U.S. 209, 221-23 (1977) ("agency shop" arrangement was permitted to prevent "free riders" on union's collective bargaining efforts); *International Association of Machinists v. Street*, 367 U.S. 740, 763-64 (1961) (same); *Hanson*, 351 U.S. at 235-38 (purpose of promoting peaceful labor relations was legitimate; without a showing that agency shop arrangements were used to force ideological conformity or to infringe on employees' freedom of expression or that dues were imposed for reasons unrelated to collective bargaining, agency shop arrangement did not violate First Amendment). Similarly, statutorily-mandated agricultural marketing collectives can pass First Amendment muster because the government has an interest in establishing and maintaining a comprehensive marketing plan for agricultural commodities. *Glickman*, 521 U.S. at 469, 473.

"Mandatory" or "unified" bars, under which dues-paying membership is required as a condition to practice law in a state, are also permitted under this theory. See generally *Lathrop v. Donohue*, 367 U.S. 820 (1961) (examining Wisconsin's mandatory bar).[3] In *Lathrop*, the

---

[3] This arrangement has been described variously as an "integrated," "mandatory" or "unified" bar. See, *e.g.*, *Romero v. Colegio de Abogados de Puerto Rico*, 204 F.3d 291, 297 n.5 (1st Cir. 2000) ("integrated" or "unified"); *Morrow v. State Bar of*

(continued...)

Court analogized a state bar to an agency shop and found that Wisconsin had an interest in establishing an integrated bar to:

> elevat[e] the educational and ethical standards of the Bar to the end of improving the quality of the legal service available to the people of the State, without reference to the political process. It cannot be denied that this is a legitimate end of state policy. We think that the Supreme Court of Wisconsin, in order to further the State's legitimate interests in raising the quality of professional services, may constitutionally require that the costs of improving the profession in this fashion should be shared by the subjects and beneficiaries of the regulatory program, the lawyers, even though the organization created to attain the objective also engages in some legislative activity.

367 U.S. at 842-43 (internal footnote omitted). The *Lathrop* Court reserved judgment on the question whether the dissenters' rights were being violated by using mandatory bar dues to support political activities, finding

---

[3]  (...continued)
*California*, 188 F.3d 1174, 1175-76 (9th Cir. 1999) ("unified" and "mandatory bar memberships"); *Schneider v. Colegio de Abogados de Puerto Rico*, 187 F.3d. 30, 31 (1st Cir. 1999) ("mandatory bar"); *Washington Legal Foundation v. Massachusetts Bar Foundation*, 993 F.2d 962, 979 (1st Cir. 1993) ("unified bar"). "Integrated" and "unified" sound more positive, but "mandatory" is closest to reality.

that the record was not sufficiently developed to address that claim. *Id*. at 847-48.

However, it is also now clear that the group speech itself is not a sufficient purpose for a mandatory association to withstand First Amendment scrutiny. In *United States v. United Foods, Inc.*, 533 U.S. 405 (2001), the Supreme Court examined an agricultural collective under which most of the collected assessments were spent on generic advertising. Although the dissenting group members were not restricted from communicating their own messages, were not compelled to participate in any actual or symbolic speech, and were not compelled to support any particular political or ideological viewpoint, the Court still held the program unconstitutional. The Court found that the underlying program was different from the program that had passed muster in *Glickman* in one critical respect: "In *Glickman* the mandated assessments for speech were ancillary to a more comprehensive program restricting marketing autonomy. Here, for all practical purposes, the advertising itself, far from being ancillary, is the principal object of the regulatory scheme." *Id*. at 411-12. A forced subsidy of group speech, in other words, is permissible when it is "a necessary incident of a larger expenditure for an otherwise proper goal requiring the cooperative activity." *Id*. at 414. In *United Foods*, there was no "larger expenditure." The principal purpose of the group was the compelled speech itself, so the Court found that the mandatory subsidy of that speech violated the dissenters' First Amendment rights.

II. *Subsidy of "Non-Germane" Speech under the First Amend-*
   *ment*

In light of these principles, Wisconsin's mandatory State Bar is constitutional, and the Objectors may be compelled to pay their share of direct and indirect expenses that are reasonably incurred by the State Bar to serve its dual constitutional purposes of regulating the legal profession and improving the quality of legal services. The Objectors' argument is that the State Bar's public image campaign simply does not fit that bill. More specifically, they argue that the constitutional issue cannot be resolved based solely on the arbitrator's finding that the State Bar's public image campaign was non-political and non-ideological. We agree that the issue of germaneness must also be part of the constitutional analysis.

In *Keller v. State Bar of California*, 496 U.S. 1 (1990), the petitioners were practicing lawyers subject to California's integrated bar. They claimed that the use of their membership dues to finance ideological or political activities that they opposed violated their rights under the First Amendment. They objected to the bar's lobbying efforts, its filing of amicus briefs in pending cases, and its expenditures for its annual conference and education programs. The California Supreme Court upheld the expenditures, but the Supreme Court of the United States reversed. It stated that the constitutionally permissible purposes of the integrated bar were to regulate the legal profession and to improve the quality of legal services. A reviewing court had to determine whether

the challenged activities were necessarily and reasonably incurred for those purposes, or whether they were "activities of an ideological nature which [would] fall outside of those areas of activity." *Keller*, 496 U.S. at 13-14. The Court explained:

> Precisely where the line falls between those State Bar activities in which the officials and members of the Bar are acting essentially as professional advisers to those ultimately charged with the regulation of the legal profession, on the one hand, and those activities having political or ideological coloration which are not reasonably related to the advancement of such goals, on the other, will not always be easy to discern. But the extreme ends of the spectrum are clear: Compulsory dues may not be expended to endorse or advance a gun control or nuclear weapons freeze initiative; at the other end of the spectrum petitioners have no valid constitutional objection to their compulsory dues being spent for activities connected with disciplining members of the Bar or proposing ethical codes for the profession.

*Id*. at 15-16.

We also learn from the Supreme Court's exploration of this question in other forced group speech contexts. In *Ellis v. Brotherhood of Railway, Airline, and Steamship Clerks*, 466 U.S. 435, 449-55 (1984), the Court considered whether a union's convention expenses, litigation expenses that were not for bargaining or grievances, union publication costs, social event expenses, employee death benefits, and expenses related to general organ-

izing efforts were "germane" to the union's purpose. The Court considered each category of expense to see whether it was "necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues." *Id*. at 448. The dissenters' belief that the money was not being well spent on any one of these endeavors was not enough. *Id*. at 456. Ultimately, without discussing whether any of the challenged categories were political or ideological, the Court found that of the challenged expenses, only the union's litigation expenses that were not for bargaining or grievances and expenses related to its organizing efforts were not germane to the union's purposes that permitted forced speech. *Id*. at 448-55. The other categories of expenditures—social events, publications, and conventions—did not infringe the objecting employees' First Amendment rights any more than their compulsory contribution to the union, and were upheld by the Court. *Id*. at 455-57.[4]

Also, in *Lehnert v. Ferris Faculty Association*, 500 U.S. 507 (1991), the Court reiterated that, to be charged to dissenting employees, the agency shop union expenses must "(1) be 'germane' to collective bargaining activity;

---

[4] At the time of the Court's opinion the union was no longer the exclusive bargaining agent, and the petitioners were no longer involved in the death benefits system. Employee death benefits were left as an open question. *Ellis*, 466 U.S. at 454-55.

(2) be justified by the government's vital policy interest in labor and peace and avoiding 'free riders'; and (3) not significantly add to the burdening of free speech that is inherent in the allowance of an agency or union shop." *Lehnert*, 500 U.S. at 519. The Court cautioned that the test did not require "a direct relationship between the expense at issue and some tangible benefit to the dissenters' bargaining unit." *Id*. at 522. We need not list the specific expenditures under review aside from one that is particularly relevant here—a public image campaign. The Court found that, under this standard, the public image campaign was not germane to the union's collective bargaining functions. *Lehnert*, 500 U.S. at 528-29.[5]

From these teachings, we conclude that in a forced group speech case, the First Amendment requires a reviewing court to consider whether challenged expenditures by dissenting members of a mandatory association are reasonably related to the constitutionally relevant purposes of that association. It is not sufficient to examine only the political or ideological nature of those expenditures without also considering whether the expenses are related to the constitutionally legitimate purposes of the association that permit forced group speech in the first place. The applicable cases do not describe the analysis as a test of "either-or," as in "either"

---

[5] The *Lehnert* Court also noted, without discussion or explanation, that the campaign was political in nature. See *id*. The Objectors have not argued that the public image campaign conducted by the Wisconsin State Bar was similarly political.

the expenditures are non-political and non-ideological "or" they are non-germane before they implicate the First Amendment. Rather, the key is the overall "germaneness" of the speech to the governmental interest at issue. The political or ideological nature of the speech factors into that ultimate analysis.

The parties have framed the issue before us as whether the Objectors may be required to subsidize speech that is not political or ideological but that is also not germane to the constitutionally permissible purposes of a mandatory bar. Since we last addressed this issue in *Thiel v. State Bar of Wisconsin*, both the Supreme Court and the First Circuit have provided additional guidance. In *United Foods*, the Supreme Court reviewed its earlier decisions in *Abood* and *Keller* and explained the test not in terms of politics or ideology but in terms of germaneness: "speech need not be characterized as political before it receives First Amendment protection," and "lawyers [can] be required to pay moneys in support of activities that [are] germane to the reason justifying the compelled association in the first place . . . . [O]bjecting members [are] not required to give speech subsidies for matters not germane to the larger regulatory purpose which justifie[s] the required association." *United Foods*, 533 U.S. at 413-14, discussing *Abood*, 431 U.S. at 232 (union dues), and *Keller*, 496 U.S. at 14 (mandatory state bar).

The First Circuit considered this problem of germaneness for bar expenditures in *Romero v. Colegio de Abogados de Puerto Rico*, 204 F.3d 291 (1st Cir. 2000). Puerto Rico's

mandatory bar (the "Colegio") required members to purchase life insurance from its group life insurance program. That expenditure was obviously not political or ideological, but could unwilling members be required to pay the bar for life insurance they did not want? Noting that in some years the insurance premium constituted as much as 72% of the bar dues, the First Circuit found the mandatory payment to the Colegio's group life insurance plan was unconstitutional, holding specifically that mandatory bar association dues could not be used to fund non-germane activities even if those activities were not ideological. See *id*. at 300 ("To say that germaneness is the test in ideological expenditure cases is not to say that it is not also a relevant inquiry in cases involving non-ideological expenditures."). In reaching its conclusion, the First Circuit considered the applicable Supreme Court precedents and the policy supporting its conclusion. As the court explained, the First Amendment permits the government to force a union or bar member to pay only for those expenses that are germane to the purposes that justify requiring the member to belong to the group in the first place:

> [S]trong public interests justify the intrusion, and the germaneness test guarantees that these public interests are being served by any challenged activity. Compelling financial support for activities wholly unrelated to those public interests, however, changes the balance and weakens the justification that supported the intrusion on First Amendment associational interests in the first place. Simply stated, that an individual may be compelled to associate and

financially contribute for some purposes does not mean she may be compelled to associate and financially contribute for all purposes. Without this germaneness check, once a person is compelled to join and support a bar association for legitimate reasons, she could be forced to pay for any bar activity for any reason or no reason, as long as it did not involve political or ideological expression. Under the Colegio's theory, for example, it could mandate that members join its life insurance program and then spend 99% of member dues on life insurance.

*Romero*, 204 F.3d at 301 (internal citation omitted). We agree with *Romero* and this reasoning.

To avoid an inquiry into germaneness, the State Bar relies heavily on our opinion in an earlier chapter of the Wisconsin bar saga, *Thiel v. State Bar of Wisconsin*, 94 F.3d 399 (7th Cir. 1996). In *Thiel*, plaintiffs challenged the facial validity of Wisconsin Supreme Court Rule 10.03(5)(b) to the extent it authorized the use of mandatory dues for non-germane, non-ideological expenditures. After resolving an Eleventh Amendment issue, the *Thiel* majority opinion reviewed the then-recent Supreme Court cases on forced speech and concluded that the court did not need to decide whether the State Bar's non-political and non-ideological speech was germane to its purposes of regulating the legal profession or improving the quality of legal services: "we hold that the First Amendment does not prohibit the Bar from funding non-ideological, non-germane activities with compelled dues." 94 F.3d at 405. The *Thiel* majority then

addressed the challenged activities and concluded that they were all in fact germane to the State Bar's legitimate purposes. *Id.* Either of these alternative holdings was sufficient to decide *Thiel* itself.

Writing separately, Judge Ripple concurred with the judgment but disagreed with the broader holding. He cautioned that all of the activities complained of in *Thiel* "fit quite comfortably within the category of non-ideological, nonpolitical activities that are germane to the regulation of the legal profession or the improvement of the quality of legal services." He concluded that the court was "not confronted here with a situation in which the bar can be said to be engaging in nonpolitical, non-ideological activities that are also completely divorced from those statutory purposes that justify mandatory dues." *Id*. at 406 (Ripple, J., concurring). Judge Ripple noted further that "certainly, the same procedural protections that ferret out activities of an ideological and political nature will also identify nongermane activities that are not ideological or political. But that does not mean necessarily that such nongermane activities need not be identified or that they can be supported by mandatory dues." *Id*.

Today's case again presents the question that divided the *Thiel* panel. The arbitrator and the district court understandably relied on the language of the majority's first alternative holding in reaching their decisions in this case. With the benefit of the later guidance from *United Foods* and the First Circuit's helpful opinion in *Romero*, however, we agree with Judge Ripple's conclu-

sion. We agree that the State Bar may use the mandatory dues of objecting members to fund only those activities that are reasonably related to the State Bar's dual purposes of regulating the profession and improving the quality of legal services, whether or not those same expenditures are also non-ideological and non-political. We thus overrule the first alternative holding in *Thiel* and hold that the First Amendment prohibits the Wisconsin State Bar from funding non-germane activities with compelled dues.[6] This holding effectively finds that the second sentence of Wisconsin Supreme Court Rule 10.03(5)(b)1 is too narrow because it authorizes objections to the use of mandatory dues only for political and ideological activities that are not reasonably related to the constitutional purposes of regulating the legal profession and improving the quality of legal services.

III. *Germaneness of the Public Image Campaign*

The State Bar argues that its public image campaign expenses were germane to improving the quality of legal services available to the people of Wisconsin. The Bar's

---

[6] Because this decision overrules the alternative holding of *Thiel*, this opinion has been circulated among all judges of this court in regular active service pursuant to Circuit Rule 40(e). No judge favored a rehearing en banc on the question of overruling that portion of *Thiel*. Judge Sykes would rehear the case on the issue of the actual germaneness of the State Bar's public image campaign, and her dissent from the denial of rehearing en banc follows.

concern was that, if the public lacks trust in lawyers and the legal system, more people may represent themselves rather than seeking out the assistance of a lawyer. On the other hand, if people have more confidence in lawyers and the legal system, they are more likely to participate in that system and will be more likely to refrain from extra-legal, and even violent, self-help measures. By attempting to promote trust in lawyers and the legal system, the public image campaign also sought to solidify the fiduciary relationship between lawyer and client and to improve lawyer-client communications by encouraging disclosure, candor, and compliance with competent advice.

The Objectors counter that there was no demonstrated connection between improvement of the public's perception of lawyers and the legal profession and the improvement of the quality of services that those lawyers provide. According to the Objectors, the public image campaign was designed to benefit lawyers, not the public, by encouraging more people to engage the services of lawyers, thus generating more fees. Although the arbitrator had "doubts" as to the germaneness of the public image campaign, he did not reach the issue because he concluded he was not authorized to decide the constitutional issue. Unlike the arbitrator, we are so authorized. The record has been supplemented, and the key facts about the content and nature of the State Bar's public image campaign are not disputed. We can apply the constitutional test for reasonableness without remand.

Under *Keller*, 496 U.S. at 14, and *Ellis*, 466 U.S. at 448, the test here is whether the challenged expenditures were "necessarily or reasonably incurred" for the constitutionally legitimate purposes that authorize mandatory dues. No one contends the public image campaign costs were "necessarily" incurred to improve the quality of legal services. The issue is whether the costs were "reasonably" incurred for that purpose. The State Bar believes there is a relationship between improving the public's trust in lawyers and improving the quality of legal services that those lawyers are able to provide. By fostering that trust, the State Bar hoped to encourage better communication between lawyers and clients, and, in doing so, to encourage development of the attorney-client relationship. The hope was that trust and communication would improve the quality of the relationship and the service provided.

Our dissenting colleague finds that theory to be speculative and unsupported by the record. We do not suggest that the theory is beyond debate. It relies on a series of assumptions: a "soft" image campaign will improve the public image of lawyers, which will lead in turn to better attorney-client relationships, which will lead in turn to better quality legal services. We do not assert that the record shows the public image campaign has actually improved the quality of legal services, but we do not see a need for a trial that would scrutinize either the subjective motives of bar leaders or the actual effectiveness of the public image campaign. The standard of review is deferential, as when we review challenged

legislation to determine whether it is reasonably related to a legitimate governmental purpose. Under that deferential standard, we find that the State Bar's theory is not unreasonable. A client who trusts his or her lawyer seems more likely to disclose relevant information, particularly if that information is sensitive, and better, more candid communication should enable lawyers to give better, more comprehensive advice—which should improve the quality of services. Also, it seems reasonable to us to expect that a client who trusts his or her lawyer is more likely to accept and act upon any advice the lawyer is able to provide. When people follow competent legal advice, the system itself is improved.

Do Wisconsin lawyers themselves benefit from the State Bar's public image campaign? We can assume that they may. If more people seek out the services of lawyers as a result of the public image campaign, those lawyers will benefit from the increased business that results. But that additional effect does not nullify the legitimacy of the campaign. Again, the State Bar is not required to prove that its expenditures were actually successful in accomplishing the stated purpose, or that they served only that purpose, or that the public image campaign was a particularly wise use of the State Bar's funds. After all, "[p]etitioners may feel that their money is not being well-spent, but that does not mean that they have a First Amendment complaint." *Ellis*, 466 U.S. at 456, quoted by *Thiel*, 94 F.3d at 405. The limited issue before us is whether the public image campaign was reasonably related to the constitutionally legitimate

purpose of improving the quality of legal services, and we find that it was.

Although the Supreme Court in *Lehnert* found that a union's public image campaign was not germane, the purposes supporting mandatory union dues (collective bargaining and grievance resolution) and a mandatory bar (regulating the profession and improving legal services) are very different. See *Lehnert*, 500 U.S. at 528-29. We find persuasive here the Ninth Circuit's decision in *Gardner v. State Bar of Nevada*, 284 F.3d 1040 (9th Cir. 2002), which distinguished *Lehnert* and found a public image campaign for lawyers was "highly germane" to the legitimate purposes of a mandatory bar. The court provided a powerful defense of the legal profession and the need for fostering—and earning—public trust:

> Among the functions of the State Bar in this case is the function identified by the district court—"to advance understanding of the law, the system of justice, and the role of lawyers, as opposed to nonlawyers, to make the law work for everyone." That purpose is satisfied by the State Bar's campaign to dispel any notion that lawyers are cheats or are merely dedicated to their own self-advancement or profit. The law, rightly understood, is not a business where the bottom line dictates the conduct that is permissible. The law is a profession where a near monopoly of access to the courts is granted to a trained group of men and women on the basis that they will follow the profession's rules of conduct and in so doing serve the cause of justice.

[Plaintiff] Gardner makes the point that lawyers are supposed to serve their clients, not "everyone." But the underlying assumption that justifies the justice system is that everyone is served by the adequate representation of conflicting interests and perspectives. It is perfectly true, not puffery, that lawyers strive to make the law work for everyone by their fair and zealous representations of their clients. It is important for the public to understand that a lawyer representing a defendant in a criminal case is not a defender of crime, and that a lawyer advising his or her client of a tax break is not a scoundrel but an ally of a government that should collect as tax no more than the law allows. It is equally important for citizens to know that a prosecutor seeking to imprison a man believed guilty of a crime is serving justice, as is the state tax department's attorneys seeking to collect a tax. The lawyer who represents a client who believes she has been unfairly denied promotion is as much a partner in the system of justice as the lawyer who acts for her employer seeking to explain the apparent discrimination.

The public needs to know that often there are two, or more, sides to a story or a situation. More's Utopia has no lawyers, but in our real world, lawyers are not merely a necessity but a blessing. If the public doesn't understand that—and the State Bar had reason to think many members of the public did not—the justice system itself will wither. The work of the State Bar to foster public understanding of the adversary nature of law is vital to the bar's function.

It is no infringement of a lawyer's First Amendment freedoms to be forced to contribute to the advancement of the public understanding of law.

284 F.3d at 1043.

The Ninth Circuit's generous approach to germaneness in *Gardner* is consistent with the portion of *Thiel* that remains binding, where we found that all of the particular activities at issue were germane to the purpose of the State Bar and could be funded with mandatory dues. The disputed activities in *Thiel* included publishing and distributing a Bill of Rights pamphlet for pre-college students, conducting an "Economics of Practice" survey designed to help lawyers address business decisions related to the practice of law, funding awards given to reporters for writing on law-related topics, sponsoring a group to assist alcoholic lawyers, local bar grants, and sponsoring a mock trial competition. *Thiel*, 94 F.3d at 405. Although we have overruled the alternative holding in *Thiel*, its unanimous assessment of the actual germaneness of these activities remains sound. There is no meaningful difference between the public image campaign at issue here and several of those expenditures we approved in *Thiel.* We do not believe the reasonableness test requires federal courts to engage in closer parsing of the State Bar's expenditures.[7] In light of

---

[7] The dissent's call for increased scrutiny of the State Bar's public image campaign would also cast doubt on the germaneness of the activities approved in *Thiel*. For reasons previously

(continued...)

*Gardner* and *Thiel*, we conclude that the State Bar's public image campaign was germane to the Bar's constitutionally legitimate purpose of improving the quality of legal services available to the Wisconsin public.

The judgment of the district court affirming the arbitrator's decision to overrule plaintiffs' objections is AFFIRMED.

SYKES, *Circuit Judge*, dissenting from the denial of rehearing en banc. Three Wisconsin lawyers filed an objection to the State Bar's use of their mandatory bar dues to fund a public-relations campaign designed to improve the image of lawyers and the legal profession. Their First Amendment challenge raises important questions about the continued viability of *Thiel v. State Bar of Wisconsin*, 94 F.3d 399 (7th Cir. 1996), the validity of Wisconsin Supreme Court Rule ("SCR") 10.03(5)(b)1, and the proper approach to the "germaneness" inquiry that determines whether a compulsory speech subsidy is

[7]  (...continued)

stated, we do not believe that this holding of *Thiel* needs to be revisited, or that the federal courts should engage in such a close parsing of the contents of the State Bar's programs.

consistent with the constitution, at least in the context of a mandatory bar. The State Bar defends *Thiel* and SCR 10.03(5)(b)1, and argues that its use of mandatory bar dues for a public-image campaign is constitutional under *Keller v. State Bar of California*, 496 U.S. 1 (1990).

My colleagues side with the challengers on the first two inquiries, overruling the primary holding in *Thiel* and effectively invalidating SCR 10.03(5)(b)1. Panel Op. at 14-22. I agree with this part of the opinion. The compelled-subsidy doctrine of *Keller* is not limited to cases challenging the use of compulsory bar dues for *ideological* or *political* activities, as *Thiel* held and the supreme court rule implies. It applies more broadly, for the reasons the panel has amply explained. Under *Keller* and the Supreme Court's related decisions in the union-shop context, a mandatory bar association may use compulsory bar dues *only* for activities that are germane to the constitutionally relevant justifications for forced bar-association membership: (1) the regulation of the legal profession; and (2) the improvement of the quality of legal services. *Keller*, 496 U.S. at 14; *see also Romero v. Colegio de Abogados de Puerto Rico*, 204 F.3d 291, 297-303 (1st Cir. 2000). Activities not germane to these purposes must be funded from voluntary dues. This is so regardless of whether the challenged expenditure qualifies as "political" or "ideological."

More specifically, *Keller* held that "the guiding standard" for assessing the constitutionality of a mandatory bar association's use of compulsory bar dues is "whether the challenged expenditures are necessarily or reasonably

incurred for the purpose of regulating the legal profession or 'improving the quality of the legal service available to the people of the State.'" 496 U.S. at 14 (quoting *Lathrop v. Donohue*, 367 U.S. 820, 843 (1961)). The panel comprehensively explains why *Keller* and more recent developments in Supreme Court caselaw require us to overrule the primary holding in *Thiel*. Panel Op. at 14-22.

Overruling *Thiel*, in turn, effectively invalidates critical limiting language in SCR 10.03(5)(b)1. This rule was adopted by the Wisconsin Supreme Court in response to *Keller* and essentially reflects the more limited understanding of *Keller* articulated in *Thiel*. The rule provides, in pertinent part, that "[t]he State Bar may not use compulsory dues of any member who objects to that use for political or ideological activities that are not reasonably intended for the purpose of regulating the legal profession or improving the quality of legal services." WIS. SUP. CT. R. 10.03(5)(b)1. To the extent that this language limits the constitutionally required germaneness inquiry to "political or ideological activities," the rule is too narrow, as the panel has correctly held.[1] Panel Op. at 22.

---

[1] The plaintiffs here—Jon Kingstad, Steven Levine, and James Thiel—are frequent mandatory-bar litigants and are currently waging a two-front war against the alleged unconstitutional use of their compulsory bar dues. This case is one front. The other is a petition before the Wisconsin Supreme Court to amend SCR 10.03(5)(b)1 to delete the language that limits the *Keller* "germaneness" inquiry to State Bar activities that are "political or ideological" in nature. *See* Pet. to Amend SCR 10.03(5)(b)1,

(continued...)

Thus far I have no quarrel with anything in the panel's analysis; to the contrary, I think it is thorough and sound.

I cannot agree, however, with the panel's application of these principles, which appears in Part III of the analysis section of the opinion. Panel Op. at 22-29. I recognize that this sort of disagreement would not ordinarily justify rehearing this case en banc. But in this case I think it does. After setting the constitutionally required germaneness inquiry on a sound doctrinal foundation, the panel applies the standard in a way that drains it of any real meaning. The panel concludes that the State Bar's public-image campaign satisfies *Keller*'s germaneness requirement; in my view, this conclusion is procedurally questionable and substantively flawed.

As to procedure, as the panel has noted, this case came into federal court from an arbitration proceeding commenced in accordance with the procedural scheme established in SCR 10.03(5)(b) for challenging State Bar expenditures of mandatory bar dues. Pursuant to the requirements of the rule, the objecting lawyers sought arbitration on the question of whether the State Bar's public-image campaign could properly be funded from

---

[1] (...continued)

No. 09-08, filed on August 24, 2009, by Petitioners Jon Kingstad, Steven Levine, James Thiel, and 40 other State Bar members, *available at* http://www.wicourts.gov/supreme/docs/ 0908petition.pdf. The state supreme court is holding this rulemaking petition in abeyance pending the outcome of this litigation.

their compulsory dues or must instead be funded from voluntary dues. The arbitrator held that because the public-image campaign was not "political or ideological," the germaneness limitation on the use of compulsory dues set forth in SCR 10.03(5)(b)1 was not implicated. The arbitrator did *not* decide the *Keller* germaneness issue, properly understood—that is, he did not decide whether the public-image campaign was germane to "improving the quality of legal services."[2] The arbitrator did, however, express some significant skepticism on the matter. He said:

> I believe that based on the evidence presented it is a stretch, in fact, to regard [improving the quality of legal services] as the campaign's primary purpose. There is simply too much in the record indicating that the predominant goals have more to do with the interests of lawyers than with the interests of their clients or potential clients.

I will return to this point in a moment.

The objecting lawyers sought judicial review of the arbitrator's decision in state court, and the State Bar removed the suit to federal court based on the lawyers' First Amendment challenge to SCR 10.03(5)(b)1 and this use of their mandatory bar dues. As I have noted, the State Bar's fallback position was that if the political/ ideological limitation in the supreme court rule was invalid, this court can and should decide the

---

[2] No one suggests that the public-image campaign had anything to do with "regulating the bar."

broader germaneness question. And that's what the panel has done.

Here's the (arguable) procedural problem: The objecting lawyers asked for a remand if they prevailed on their claim that the supreme court rule is unconstitutional. They said a remand was appropriate because the arbitrator did not decide the broader germaneness question and because the record in the district court on that issue is nonexistent or at best incomplete. It's not entirely clear to me whether a remand is necessary or appropriate under the circumstances. What *is* clear, however, is that the panel's germaneness holding rests *entirely* on broad and generalized assertions about public trust in the legal profession, not on anything in the record.

And this is where I think the opinion is off-track as a substantive matter. The panel concludes that the State Bar's public-image campaign is indeed germane to "improving the quality of legal services." The rationale for this conclusion is essentially twofold. First, the panel simply accepts the Bar's assertion that the point of the image campaign was to foster public trust in the legal profession and defers to the Bar's "theory" that greater public trust will improve the quality of the legal services Wisconsin lawyers provide to their clients. Panel Op. at 24-25. Second, the panel adopts the rationale of the Ninth Circuit's decision in *Gardner v. State Bar of Nevada*, 284 F.3d 1040 (9th Cir. 2002), an analogous case involving a First Amendment challenge to the Nevada State Bar's use of compulsory dues to fund a similar

public-relations campaign. Panel Op. at 26-28. This is a serious misapplication of *Keller'*s germaneness requirement. The panel credits the Bar's germaneness "theory" with little critical analysis and assigns *Gardner* far more persuasive weight than it can reasonably bear.

The State Bar's factual characterization of the image campaign is called into question by the very slogan under which the public-relations effort flies: "Wisconsin Lawyers. Expert Advisors. Serving You." The Bar's purpose here is unmistakable: It is to boost public opinion of Wisconsin's lawyers, not enhance public understanding of the legal profession or improve the quality of the work lawyers do for their clients or the public. To be "germane" to "improving the quality of legal services," an expenditure of compulsory bar dues should as a factual matter have at least *some* connection to the law, legal advising, legal education, legal ethics, or the practice of law. The public-image campaign was aimed at none of these things; it was all about marketing. Indeed, the State Bar called it a "Branding Initiative" and pitched it to Wisconsin's lawyers as a public-relations effort designed to "brand the profession" in order to "improve the public's perception of the profession."

The ads themselves were totally content-free, at least insofar as conveying any meaningful information about the law or the role of lawyers in our legal system. They depicted lawyers engaged in various forms of legal and nonlegal volunteer work in their communities. This kind of "soft" advertising may have a place in the package of services a bar association might legitimately want to

provide for its members, but let's not pretend it had anything to do with educating the public about the actual role of lawyers in our legal system. This was an *image* campaign, after all.

But even accepting at face value the State Bar's contention that the ads were designed to promote public understanding of and therefore trust in the legal profession, any claim that the image campaign was reasonably related to improving the quality of legal services is at best strained and at worst a little odd. To state the obvious—and as the arbitrator recognized—an ad campaign directed at boosting sagging public opinion of the legal profession serves the interests of *lawyers*, not their clients or the public. In what sense was this an expenditure "necessarily or reasonably incurred for the purpose of . . . improving the quality of . . . legal service[s]," as required by *Keller*? 496 U.S. at 14. The opinion contains a number of conclusory assertions on this point—e.g., that greater public trust as a general matter will yield better communication between individual clients and their attorneys and ultimately lead to more competent legal advice. Panel Op. at 24-25. This strikes me as both implausible and entirely speculative; it is highly attenuated as a matter of constitutional justification and in any event is completely unsupported on this record.[3]

---

[3] I am not suggesting that the germaneness inquiry requires an examination of the "subjective motives of bar leaders" or that the State Bar must establish that its "expenditures were

(continued...)

The Ninth Circuit's opinion in *Gardner*, on which the panel heavily relies, is long on rhetoric and short on reasoning. It also misses the whole point of *Keller*. *Gardner* rests its conclusion entirely on lofty truisms about the importance of lawyers and a naked assertion that the public "needs to know" about their role in making the justice system work. From this the court concludes that the Nevada State Bar's public-relations campaign is "highly germane to the purposes for which the State Bar exists." *Gardner*, 284 F.3d at 1043. This is not the correct legal standard. The pertinent question is *not* whether the challenged expenditure is reasonably related to *any* purpose for which a bar association exists; that is useless as a decision principle if the point is to protect free-speech rights in the context of forced bar-

---

3 (...continued)

actually successful in accomplishing its stated purpose." Panel Op. at 24-25. *Keller*'s germaneness requirement does not require close scrutiny of a challenged expenditure of compulsory bar dues, but it requires something more than mere rational-basis review, which applies to all laws, starts from a presumption of constitutionality, and "deems a law valid if any justification for it may be imagined." *United States v. Skoien,* No. 08-3770, 2010 WL 2735747, at *3 (7th Cir. July 13, 2010) (citing *Vance v. Bradley*, 440 U.S. 93 (1979)). *Keller*'s germaneness requirement implements the protections of the First Amendment; it therefore is not analogous to rational-basis review, as my colleagues suggest. Panel Op. at 24-25 ("The [germaneness] standard of review is deferential, as when we review challenged legislation to determine whether it is reasonably related to a legitimate governmental purpose.").

association membership. The pertinent question—the one the Supreme Court said is the "guiding standard" for First Amendment purposes—is whether the challenged expenditure is reasonably related to one of the *constitutionally relevant* purposes that justify mandatory bar membership: regulation of the bar or improving the quality of legal services. *Keller*, 496 U.S. at 14. The Ninth Circuit did not address *this* question, and it is the only one that matters. The court made no effort, that is, to explain how the Nevada State Bar's expenditure of compulsory bar dues on a public-image campaign for lawyers was "necessarily or reasonably incurred for the purpose of . . . improving the quality of . . . legal service[s]." *Gardner* is unpersuasive. We should not follow it.

In the end, while the panel has done an exemplary job of articulating the constitutional principles that govern this case, its application of those principles effectively dilutes them.[4] I have no objection to a "generous"

---

[4] As the panel observes, *Thiel*'s alternative holding provides some support for a loose and highly deferential understanding of the germaneness review required by *Keller*. Panel Op. at 28-29. *Thiel* approved the use of compulsory bar dues for a variety of programs sponsored by the State Bar of Wisconsin—including a mock-trial competition and awards given to reporters for law-related writing—but offered no explanation for this conclusion. 94 F.3d at 405 ("All of these [programs], it seems, are geared towards improving the quality of legal services in Wisconsin. Under *Keller*, they are germane and

(continued...)

interpretation of the germaneness requirement. Panel Op. at 28. But the panel has gone well beyond "generous." If a public-image campaign designed to benefit lawyers can be considered germane to improving the legal services they provide to their clients, then the germaneness standard in this circuit is not merely generous, it is meaningless. I would rehear this case en banc.

---

[4] (...continued)

may be funded by compulsory dues, regardless of whether they are ideologically oriented."). My colleagues summarily reaffirm this aspect of *Thiel*. Panel Op. at 28-29 (*Thiel*'s "unanimous assessment of the actual germaneness of [the challenged] activities remains sound."). This alternative holding in *Thiel*, and the panel's endorsement of it here, reflect an implicit concern about excessive federal-court involvement in the affairs of state bar associations. I share that concern. But the state supreme court's decision to make bar-association membership mandatory for all lawyers operates as a continuing burden on their First Amendment rights, which imposes constitutional responsibilities on the State Bar and makes a federal-court role inevitable, or at least unavoidable. And in this context, deference does not have a particularly strong claim. The State Bar is not (as the Supreme Court observed in *Keller*) "the typical government official or agency." 496 U.S. at 12.

---